Choe-Groves, Judge:
 

 Plaintiffs Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C. ("CAADES"), Consejo Agrícola de Baja California, A.C. ("CABC"), Asociación Mexicana de Horticultura Protegida, A.C. ("AMHPAC"), Asociación de Productores de Hortalizas del Yaqui y Mayo ("APHYM"), and Sistema Producto Tomate ("SPT") (collectively, "Plaintiffs"), brought this action on May 9, 2019, related to the Department of Commerce's ("Commerce") withdrawal from a suspension agreement and subsequent continuation of an antidumping duty investigation. Summons, May 9, 2019, ECF No. 1; Compl., May 9, 2019, ECF No. 2. For the reasons that follow, Plaintiffs' motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") is denied.
 

 BACKGROUND
 

 Commerce initiated an antidumping duty investigation on April 18, 1996 into fresh tomatoes from Mexico to determine whether imports of fresh tomatoes were, or were likely to be, sold in the United States at less than fair value ("LTFV").
 
 Initiation of Antidumping Duty Investigation: Fresh Tomatoes from Mexico
 
 ,
 
 61 Fed. Reg. 18,377
 
 (Dep't Commerce Apr. 25, 1996). The U.S. International Trade Commission completed an investigation and issued an affirmative preliminary injury determination on May 16, 1996.
 
 Fresh Tomatoes from Mexico
 
 , USITC Pub. 2967, Inv. No. 731-TA-747 (May 1996) (Preliminary),
 
 available at
 
 https://www.usitc.gov/publications/701_731/PUB2967.pdf (last visited Jun. 6, 2019). Commerce issued an affirmative preliminary determination on October 28, 1996, finding that imports of fresh tomatoes from Mexico were being sold at LTFV in the United States.
 
 Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Fresh Tomatoes From Mexico
 
 ,
 
 61 Fed. Reg. 56,608
 
 (Dep't Commerce Nov. 1, 1996) ("
 
 Fresh Tomatoes From Mexico Preliminary Determination
 
 ").
 

 *1392
 
 On the same day, Commerce signed an agreement with producers, who accounted for substantially all imports of fresh tomatoes from Mexico, and suspended the antidumping duty investigation.
 
 See
 

 Suspension of Antidumping Investigation: Fresh Tomatoes from Mexico
 
 ,
 
 61 Fed. Reg. 56,618
 
 (Dep't Commerce Nov. 1, 1996).
 

 Over the next twenty-three years, Commerce and producers of fresh tomatoes from Mexico entered into a series of agreements that suspended the 1996 antidumping duty investigation.
 
 See
 

 Fresh Tomatoes From Mexico: Termination of Suspension Agreement, Rescission of Administrative Review, and Continuation of the Antidumping Duty Investigation
 
 ,
 
 84 Fed. Reg. 20,858
 
 (Dep't Commerce May 13, 2019) ("
 
 Termination of Suspension Agreement, Rescission of Administrative Review, and Continuation of the Antidumping Duty Investigation
 
 "). The most recent of these agreements entered into force on March 4, 2013.
 
 Fresh Tomatoes From Mexico: Suspension of Antidumping Investigation
 
 ,
 
 78 Fed. Reg. 14,967
 
 (Dep't Commerce Mar. 8, 2013) ("2013 Suspension Agreement").
 

 The 2013 Suspension Agreement provided that any party may withdraw from the Agreement upon 90 days' written notice. 2013 Suspension Agreement at 14,971. Commerce provided written notice of its intent to withdraw from the 2013 Suspension Agreement on February 6, 2019. Letter from P. Lee Smith, Deputy Assistant Secretary for Policy & Negotiations, Enforcement & Compliance, U.S. Department of Commerce to Signatories to the 2013 Suspension Agreement on Fresh Tomatoes from Mexico (Feb. 6, 2019), Attachment A, May 14, 2019, ECF No. 22-1.
 

 Commerce provided notice of its intent to continue the suspended antidumping duty investigation on May 7, 2019, which was published in the Federal Register on May 13, 2019.
 
 Termination of Suspension Agreement, Rescission of Administrative Review, and Continuation of the Antidumping Duty Investigation
 
 ,
 
 84 Fed. Reg. 20,858
 
 (Dep't Commerce May 13, 2019).
 

 Plaintiffs brought the present action and moved for a TRO and PI on May 9, 2019. Summons, May 9, 2019, ECF No. 1; Compl., May 9, 2019, ECF No. 2; Pls.' Mot. for TRO and PI Against Defendant, May 9, 2019, ECF No. 8. Plaintiffs' TRO and PI motion seeks to enjoin Commerce from (1) "ordering a suspension of the liquidation of entries of fresh tomatoes from Mexico," (2) "resuming its antidumping investigation into those tomatoes," and (3) "instructing the U.S. Customs and Border Protection to require a cash deposit or bond for each entry of those tomatoes, pending the Court's disposition of this civil action." Pls.' Mot. for TRO and PI Against Defendant, May 9, 2019, ECF No. 8; Pls.' Mem. in Support of Mot. for TRO and PI, May 9, 2019, ECF No. 9 ("Pls.' Mem."). The court expedited briefing on the TRO and PI motion and requested supplemental briefing on subject-matter jurisdiction on May 10, 2019. Order, May 10, 2019, ECF No. 13.
 

 The Florida Tomato Exchange ("FTE") moved to intervene on May 10, 2019. Partial Consent Mot. to Intervene as a Matter of Right, May 10, 2019, ECF No. 14. The court permitted FTE to intervene as a Defendant-Intervenor under USCIT Rule 24(b). Order, May 10, 2019, ECF No. 18.
 

 Defendant and FTE responded on May 14, 2019. Def.'s Resp. to Pls.' Mot. for TRO and PI, May 14, 2019, ECF No. 22 ("Def.'s Resp."); Resp. of the FTE to Pls.' Mot. for a TRO and PI, May 14, 2019, ECF No. 21 ("FTE's Resp."). Plaintiffs replied on May 15, 2019. Pls.' Mem. in Reply to Def.'s and Intervenor's Opp'ns to Pls.' Mot. for TRO and PI, May 15, 2019, ECF
 

 *1393
 
 No. 23 ("Pls.' Reply"). Plaintiffs filed an Amended Complaint on May 15, 2019. Am. Compl., May 15, 2019, ECF No. 24 ("Am. Compl.").
 

 The court held a TRO and PI Hearing on May 16, 2019. Hearing, May 16, 2019, ECF No. 25. Plaintiffs, Defendant, and Defendant-Intervenor provided supplemental briefing and exhibits on May 17, 2019. Pls.' Post-Hr'g Mem., May 17, 2019, ECF No. 29; Pls.' Post-Hr'g Mem., May 17, 2019, ECF No. 27; Def.'s Suppl. Br., May 17, 2019, ECF No. 28 ("Def.'s Suppl. Br."); Suppl. Br. FTE, May 17, 2019, ECF No. 26. Defendant moved to strike Plaintiffs' post-hearing briefs and Plaintiffs' supplement exhibit numbers 8 through 14 on May 20, 2019. Def.'s Mot. to Strike Portions of Pls.' Post-Hr'g Mem., or Alternatively for Leave to File a Sur-Reply to Pls.' Mem., May 20, 2019, ECF No. 30. The court denied Defendant's motion to strike. Order, May 20, 2019, ECF No. 31. Plaintiffs filed a supplemental memorandum on May 28, 2019. Pls.' Emergency Supplemental Memorandum, May 28, 2019, ECF No. 33 ("Pls.' Suppl. Mem."). Defendant responded. Def.'s Resp. to Pls.' Emergency Suppl. Mem., May 29, 2019, ECF No. 34 ("Def.'s Suppl. Mem. Resp."). Plaintiffs replied. Pls.' Reply to Def.'s Resp. to Pls.' Emergency Suppl. Mem., May 30, 2019, ECF No. 35.
 

 DISCUSSION
 

 I. Subject-Matter Jurisdiction
 

 The U.S. Court of International Trade, like all federal courts, is one of limited jurisdiction and is "presumed to be 'without jurisdiction' unless 'the contrary appears affirmatively from the record.' "
 
 DaimlerChrysler Corp. v. United States
 
 ,
 
 442 F.3d 1313
 
 , 1318 (Fed. Cir. 2006) (quoting
 
 King Iron Bridge & Mfg. Co. v. Otoe Cty.
 
 ,
 
 120 U.S. 225
 
 , 226,
 
 7 S.Ct. 552
 
 ,
 
 30 L.Ed. 623
 
 (1887) ). The Court is empowered to hear civil actions brought against the United States pursuant to the specific grants of jurisdiction enumerated under
 
 28 U.S.C. §§ 1581
 
 (a) - (i) (2012). The party invoking jurisdiction must allege sufficient facts to establish the court's jurisdiction,
 

 id.
 

 (citing
 
 McNutt v. Gen. Motors Acceptance Corp. of Ind.
 
 ,
 
 298 U.S. 178
 
 , 189,
 
 56 S.Ct. 780
 
 ,
 
 80 L.Ed. 1135
 
 (1936) ), and therefore bears the burden of establishing it.
 
 Kokkonen v. Guardian Life Ins. Co. of Am.
 
 ,
 
 511 U.S. 375
 
 , 377,
 
 114 S.Ct. 1673
 
 ,
 
 128 L.Ed.2d 391
 
 (1994).
 

 Plaintiffs plead jurisdiction under
 
 28 U.S.C. §§ 1581
 
 (i)(2) and (4). Am. Compl. ¶ 2. Under
 
 28 U.S.C. § 1581
 
 (i), the Court has exclusive jurisdiction over:
 

 any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for- ...
 

 (2) tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue; ... [and]
 

 (4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section.
 

 28 U.S.C. § 1581
 
 (i). The court's residual jurisdiction under
 
 28 U.S.C. § 1581
 
 (i) may not be invoked when jurisdiction under another subsection of § 1581 is or could have been available, unless the remedy provided under that other subsection would be manifestly inadequate.
 
 Ford Motor Co. v. United States
 
 ,
 
 688 F.3d 1319
 
 , 1323 (Fed. Cir. 2012).
 

 When determining jurisdiction, the court looks to the true nature of the action.
 
 Hartford Fire Ins. Co. v. United States
 
 ,
 
 544 F.3d 1289
 
 , 1293 (Fed. Cir. 2008). The true nature of an action depends on the facts asserted in the pleadings.
 

 *1394
 

 Hutchison Quality Furniture, Inc. v. United States
 
 ,
 
 827 F.3d 1355
 
 , 1360 (Fed. Cir. 2016). To determine the true nature of an action, the court identifies the particular agency action that is the source of the alleged harm, which in turn identifies the subsection of
 
 28 U.S.C. § 1581
 
 that provides the appropriate vehicle for judicial review.
 

 Id.
 

 Plaintiffs do not explicitly identify a subsection of
 
 28 U.S.C. § 1581
 
 that would form the predicate for
 
 28 U.S.C. § 1581
 
 (i) jurisdiction, so the court examines the facts and claims alleged by the Plaintiffs.
 
 See
 
 Pls.' Reply 11.
 

 The Amended Complaint's factual statement begins with the 1996 investigation into
 
 Fresh Tomatoes from Mexico
 
 .
 
 See
 
 Am. Compl. ¶ 6 (citing
 
 Initiation of Antidumping Duty Investigation: Fresh Tomatoes from Mexico
 
 ,
 
 61 Fed. Reg. 18,377
 
 (Dep't Commerce Apr. 25, 1996) ). Plaintiffs' factual statement then addresses the 2013 Suspension Agreement and Commerce's withdrawal from the 2013 Suspension Agreement.
 

 Id.
 

 at ¶¶ 7-17
 
 . Plaintiffs allege that Commerce is not authorized by 19 U.S.C. § 1673c(i) and the statute's implementing regulations to (1) "order[ ] a suspension of the liquidation of unliquidated entries of fresh tomatoes from Mexico," (2) "resum[e] the antidumping duty investigation into fresh tomatoes from Mexico that [Commerce] initiated in 1996 'as if' it were based on a preliminary determination made on May 7, 2019," and (3) "instruct[ ] the U.S. Customs and Border Protection ... to require a cash deposit or bond for each entry of fresh tomatoes from Mexico," and that Commerce's actions are "void
 
 ab initio.
 
 "
 
 See
 
 Am. Compl. at ¶ 16; Pls.' Reply 11;
 
 see also
 
 TRO and PI Hr'g Oral Argument at 2:42:53-2:43:22, 3:01:02-3:02:30. Defendant counters that Commerce's actions are permitted by the statutes governing an antidumping investigation, and Plaintiffs may challenge Commerce's actions following the final determination pursuant to
 
 28 U.S.C. § 1581
 
 (c). Def.'s Resp. 10, 17;
 
 see also
 
 TRO and PI Hr'g Oral Argument at 3:05:20; FTE's Resp. 7-13.
 

 The court concludes that the facts and allegations in Plaintiffs' Amended Complaint indicate that the particular agency action at issue is Commerce's withdrawal from the 2013 Suspension Agreement. For the purpose of assessing jurisdiction under
 
 28 U.S.C. § 1581
 
 (i), the court determines that the true nature of Plaintiffs' action pertains to administration and enforcement of a matter described in
 
 28 U.S.C. § 1581
 
 (c).
 

 A. Availability of
 
 28 U.S.C. § 1581
 
 (c)
 

 The court considers whether jurisdiction under
 
 28 U.S.C. § 1581
 
 (c) is or could be available in the present action.
 
 See
 

 Ford
 
 ,
 
 688 F.3d at 1323
 
 . Plaintiffs argue that jurisdiction under section 1581(c) is not available.
 
 See
 
 TRO and PI Hr'g Oral Argument at 17:30-19:10; Pls.' Reply 12 ("Given the true nature of CAADES' lawsuit, the only statute that confers jurisdiction on this Court is
 
 28 U.S.C. § 1581
 
 (i).");
 
 see also
 
 Am. Compl. ¶¶ 1-2 (asserting jurisdiction under
 
 28 U.S.C. § 1581
 
 (i) without elaboration). Defendant counters that jurisdiction under section 1581(c) is not yet available and that jurisdiction will be available to Plaintiffs' challenges "when Commerce completes its resumed investigation." Def.'s Resp. 7. Defendant-Intervenor argues that Plaintiffs do not show that jurisdiction under
 
 19 U.S.C. § 1581
 
 (c) is either unavailable or inadequate.
 
 See
 
 FTE Resp. 7-9.
 

 Under
 
 28 U.S.C. § 1581
 
 (c), the U.S. Court of International Trade has exclusive jurisdiction over any civil action commenced under 19 U.S.C. § 1516a.
 
 See
 

 28 U.S.C. § 1581
 
 (c). In the context of a suspension agreement, 19 U.S.C. § 1516a identifies three determinations subject to
 
 *1395
 
 judicial review: (1) the determination to suspend an antidumping duty investigation, (2) the final determination of a continued investigation, and (3) an injurious effect determination. 19 U.S.C. §§ 1516a(a)(2)(B)(iv) & (v). The determination to withdraw from a suspension agreement is not specifically provided for in 19 U.S.C. § 1516a.
 
 See
 
 19 U.S.C. § 1516a.
 

 The court concludes that jurisdiction under
 
 28 U.S.C. § 1581
 
 (c) is unavailable in the context of Plaintiffs' present action arising out of the 2013 Suspension Agreement because (i) Plaintiffs challenge the legality of specific Commerce instructions following the withdrawal from a suspension agreement, (ii) 19 U.S.C. § 1516a does not identify Commerce's decision to withdraw from a suspension agreement as reviewable, and (iii) Plaintiffs do not directly challenge an identified determination reviewable under 19 U.S.C. § 1516a.
 

 B. Jurisdiction Under
 
 28 U.S.C. § 1581
 
 (i)
 

 Plaintiffs' complaint challenges (1) the "suspension of the liquidation of unliquidated entries of fresh tomatoes from Mexico," (2) the "resum[ption of] the antidumping duty investigation into fresh tomatoes from Mexico that [Commerce] initiated in 1996 'as if' it were based on a preliminary determination made on May 7, 2019," and (3) Commerce's "instruct[ions to] the U.S. Customs and Border Protection ... to require a cash deposit or bond for each entry of fresh tomatoes from Mexico." Am. Compl. ¶ 1. The court determines that Plaintiffs' first and third challenged actions (the suspension of liquidation and the instructions requiring a cash deposit or bond) arise out of a duty on the importation of merchandise for a reason other than the raising of revenue,
 
 i.e.
 
 , the continued antidumping investigation.
 
 See
 

 Termination of Suspension Agreement, Rescission of Administrative Review, and Continuation of the Antidumping Duty Investigation
 
 at 20,860. The court determines that all three challenged actions pertain to the administration and enforcement of a matter referred to in
 
 28 U.S.C. § 1581
 
 (c),
 
 i.e.
 
 , actions leading to a final determination from a continued investigation.
 
 See
 
 19 U.S.C. § 1516a(a)(2)(B)(iv). The court concludes that subject-matter jurisdiction exists over this action under
 
 28 U.S.C. § 1581
 
 (i).
 

 II. Exhaustion of Administrative Remedies
 

 Because the court has jurisdiction under
 
 28 U.S.C. § 1581
 
 (i) and in light of Plaintiffs' motion for emergency injunctive relief in this action, the court exercises its discretion to waive the exhaustion of administrative remedies pursuant to
 
 28 U.S.C. § 2637
 
 .
 
 See
 

 28 U.S.C. § 2637
 
 (d).
 

 III. Plaintiffs' Motion for TRO and PI
 

 USCIT Rule 65 allows for a court to grant injunctive relief in an action. USCIT R. 65 ;
 
 28 U.S.C. § 2643
 
 . The court considers four factors when evaluating whether to grant a temporary restraining order or preliminary injunction: (1) whether the party will incur irreparable harm in the absence of such injunction; (2) whether the party is likely to succeed on the merits of the action; (3) whether the balance of hardships favors the imposition of the injunction; and (4) whether the injunction is in the public interest.
 
 See
 

 Winter v. Nat. Res. Def. Council, Inc.
 
 ,
 
 555 U.S. 7
 
 , 20,
 
 129 S.Ct. 365
 
 ,
 
 172 L.Ed.2d 249
 
 (2008) ;
 
 see also
 

 Wind Tower Trade Coal. v. United States
 
 ,
 
 741 F.3d 89
 
 , 95 (Fed. Cir. 2014). No one factor is necessarily dispositive because the weakness regarding one factor may be overborne by the strength of the others.
 
 Belgium v. United States
 
 ,
 
 452 F.3d 1289
 
 , 1292-93 (Fed. Cir. 2006) (quoting
 
 *1396
 

 FMC Corp. v. United States
 
 ,
 
 3 F.3d 424
 
 , 427 (Fed. Cir. 1993) ).
 

 A. Likelihood of Success on the Merits
 

 Plaintiffs contend that pursuant to 19 U.S.C. § 1673c(i) and the statute's implementing regulations, Commerce may not (1) suspend liquidation on entries of fresh tomatoes from Mexico, (2) resume the antidumping duty investigation "as if" the preliminary determination had been made on May 7, 2019, and (3) require cash deposits or bonds.
 
 See
 
 Am. Compl. ¶¶ 1, 16; Pls.' Reply 1, 23;
 
 see also
 
 TRO and PI Hr'g Oral Argument at 2:42:53-2:43:22, 3:01:02-3:02:30. In order to succeed on the merits, Plaintiffs must establish that: (1) Commerce took these actions pursuant to 19 U.S.C. § 1673c(i), (2) Commerce's actions were not taken under the authority of 19 U.S.C. § 1673b (preliminary determinations) and 19 U.S.C. § 1673d (final determinations), and (3) that Commerce's actions were not permitted pursuant to 19 U.S.C. § 1673c(i).
 
 See
 
 Pls.' Mem. 1.
 

 First, Plaintiffs are unlikely to be able to establish that Commerce's instructions were issued under the authority of 19 U.S.C. § 1673c(i), which is a provision relating to violations of a suspension agreement. Plaintiffs assert that the Government must have issued its instructions pursuant to the violation provisions in 19 U.S.C. § 1673c(i), despite the Government's denial of this assertion. Defendant states that Commerce withdrew from the 2013 Suspension Agreement pursuant to Section VI.B of the 2013 Suspension Agreement. Def.'s Suppl. Br. 4;
 
 see also
 

 Termination of Suspension Agreement, Rescission of Administrative Review, and Continuation of the Antidumping Duty Investigation
 
 at 20,861. Plaintiffs do not contest that Commerce may withdraw from the 2013 Suspension Agreement pursuant to Section VI.B of the 2013 Suspension Agreement,
 
 [1]
 
 but assert that 19 U.S.C. § 1673c(i) must be the apparent basis for Commerce's actions because: (1) Commerce cited Section 734(i)(1)(B) of the Tariff Act of 1930, which is codified as 19 U.S.C. § 1673c(i)(1)(B), "for guidance" and Commerce states that its actions are "[c]onsistent with Section 734(i)(1)(B)," and (2) Plaintiffs argue that the Government "pretend[ed]" to have made a preliminary determination as of May 7, 2019, when Commerce withdrew from the 2013 suspension agreement.
 
 See
 

 Termination of Suspension Agreement, Rescission of Administrative Review, and Continuation of the Antidumping Duty Investigation
 
 at 20,861 ; Pls.' Suppl. Mem. 2-5.
 

 It is unlikely that Plaintiffs will succeed on the merits in this action. The court finds that the stated basis for Commerce's withdrawal from the 2013 Suspension Agreement is the voluntary withdrawal provision with 90 days' notice, and that Commerce did not withdraw from the 2013 Suspension Agreement due to a perceived violation of the 2013 Suspension Agreement.
 

 The court also finds that a preliminary determination was made in 1996 when
 
 *1397
 
 Commerce issued an affirmative preliminary determination decision pursuant to 19 U.S.C. § 1673b, finding that imports of fresh tomatoes from Mexico were being sold at LTFV in the United States.
 
 Fresh Tomatoes From Mexico Preliminary Determination
 
 at 56,608. Because Commerce did not cite 19 U.S.C. § 1673c(i) as the authority for its actions and Commerce's actions could be based on an affirmative preliminary determination issued pursuant to 19 U.S.C. § 1673b, the court concludes that Plaintiffs are unlikely to be able to prove the first necessary finding, that Commerce took these actions pursuant to 19 U.S.C. § 1673c(i).
 

 Second, Plaintiffs are unlikely to be able to establish that Commerce's actions were not taken under the authority of 19 U.S.C. § 1673b (preliminary determinations) and 19 U.S.C. § 1673d (final determinations).
 
 See
 
 19 U.S.C. §§ 1673b, 1673d. The court has already addressed that an affirmative preliminary determination was noticed pursuant to 19 U.S.C. § 1673b in 1996.
 
 See
 

 Fresh Tomatoes From Mexico Preliminary Determination
 
 at 56,608. Regarding Plaintiffs' challenge to Commerce's suspension of liquidation on entries of fresh tomatoes from Mexico, the court notes that following an affirmative preliminary determination from both the ITC and Commerce, 19 U.S.C. § 1673b requires Commerce to "order the suspension of liquidation of all entries of merchandise subject to the determination." 19 U.S.C. § 1673b(d)(2). Plaintiffs challenge Commerce's resumption of the antidumping duty investigation "as if" the preliminary determination had been made on May 7, 2019. Under 19 U.S.C. § 1673d, Commerce is required to proceed toward the issuance of a final determination following an affirmative preliminary determination. 19 U.S.C. § 1673d(a)(1) ("Within 75 days after the date of its preliminary determination ... the administering authority shall make a final determination."). Plaintiffs' claim overlooks the fact that the 1996 Preliminary Determination was noticed on the same day as the 1996 Suspension Agreement, and that Commerce's schedule for issuance of a final determination is explicitly based on Commerce's schedule as set forth in the 1996 Preliminary Determination:
 

 As explained in its 1996 Preliminary Determination, Commerce previously postponed the final determination until the 135th day after the date of the preliminary determination. Commerce, therefore, intends to issue its final determination in the investigation 135 days after the effective date of withdrawal from and termination of the 2013 Agreement.
 

 Termination of Suspension Agreement, Rescission of Administrative Review, and Continuation of the Antidumping Duty Investigation
 
 at 20,860. Plaintiffs also challenge Commerce's instructions requiring a cash deposit or bond. The court notes that under 19 U.S.C. § 1673b, Commerce must "order the posting of a cash deposit, bond, or other security." 19 U.S.C. § 1673b(d)(1)(B). The court concludes that each of Commerce's actions challenged by Plaintiffs are mandated actions required by statute following a preliminary determination.
 

 Third, as each of Commerce's actions challenged by Plaintiffs are required by 19 U.S.C. §§ 1673b and 1673d, Plaintiffs' claims are likely to fail on the merits before the court reaches the issue of whether Commerce's actions were permitted pursuant to 19 U.S.C. § 1673c(i).
 

 Because Commerce is required to take each of the actions challenged by Plaintiffs following an affirmative preliminary determination, the court determines that Plaintiffs have not met their burden to establish a likelihood of success on the merits. The
 
 *1398
 
 likelihood of success on the merits weighs against the issuance of a TRO or PI.
 

 B. Irreparable Harm Absent Immediate Relief
 

 Plaintiffs must show that they will suffer irreparable harm absent a grant of injunctive relief.
 
 See
 

 Winter
 
 ,
 
 555 U.S. at 20
 
 ,
 
 129 S.Ct. 365
 
 . Irreparable harm includes "a viable threat of serious harm which cannot be undone."
 
 Zenith Radio Corp. v. United States
 
 ,
 
 710 F.2d 806
 
 , 809 (Fed. Cir. 1983) (internal citations omitted). An allegation of financial loss alone generally does not constitute irreparable harm if future money damages can provide adequate corrective relief.
 
 See
 

 Sampson v. Murray
 
 ,
 
 415 U.S. 61
 
 , 90,
 
 94 S.Ct. 937
 
 ,
 
 39 L.Ed.2d 166
 
 (1974). Bankruptcy or substantial loss of business may constitute irreparable harm because "loss of business renders a final judgment ineffective, depriving the movant of meaningful judicial review."
 
 Harmoni Int'l Spice, Inc. v. United States
 
 , 41 CIT ----, ----,
 
 211 F. Supp. 3d 1298
 
 , 1307 (2017) (citing
 
 Doran v. Salem Inn, Inc.
 
 ,
 
 422 U.S. 922
 
 , 932,
 
 95 S.Ct. 2561
 
 ,
 
 45 L.Ed.2d 648
 
 (1975) ). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities" may also constitute irreparable harm.
 
 See
 

 Celsis In Vitro, Inc. v. CellzDirect, Inc.
 
 ,
 
 664 F.3d 922
 
 , 930 (Fed. Cir. 2012). The showing of irreparable harm must be concrete and more than merely speculative.
 

 Plaintiffs argue that they will suffer irreparable harm in the form of lost sales, loss of goodwill, and loss of business opportunities.
 
 See
 
 Pls.' Mem. 7. Plaintiffs contend that Mexican tomato growers "stand to lose half their exports" which represent "sales and customers that the Mexican [tomato] [g]rowers cannot retrieve," and that "[e]ven if the Mexican [tomato] [g]rowers ultimately ... recover the cash deposits," the Mexican tomato growers "will never recover the lost sales revenue and may never recover lost partners and customers."
 
 See
 

 id.
 

 Plaintiffs' arguments regarding irreparable harm proffer that a reduction in imports of fresh tomatoes from Mexico would have a disruptive effect on the supply chain of fresh tomatoes, and that Plaintiffs will incur a "significant burden" due to Commerce's requirement to submit data pertaining to the continued investigation in a few weeks as compared to several months.
 
 Id.
 
 at 7-8. In support, Plaintiffs offered,
 
 inter alia
 
 , testimonial and documentary evidence, including: the declaration and testimony of Mr. A. Martin Ley, declarations of certain Plaintiffs and industry participants, two declarations of Plaintiffs' counsel, Mr. Neil Koslowe, a memorandum from Dr. Timothy J. Richards, a University of Arizona study summary, a letter to the Department of Commerce's Secretary Wilbur Ross from a Mexican government official, a news article, documentary submissions relating to the 2013 Suspension Agreement, and documents pertaining to Commerce's continued investigation into fresh tomatoes from Mexico.
 
 [2]
 

 *1399
 
 Defendant and Defendant-Intervenor counter that Plaintiffs have not demonstrated immediate, irreparable harm and challenge Plaintiffs' evidence as speculative and unsupported. Def.'s Resp. 10-11;
 
 see also
 
 FTE's Resp. 16-18.
 

 First, the court considers Plaintiffs' assertions of lost sales and loss of export volume. Plaintiffs submitted,
 
 inter alia
 
 , the declaration and testimony of Mr. Ley, who was subject to cross-examination, and the declaration of Mr. Ureta. Mr. Ley testified that Mexican tomato growers would experience lost sales.
 
 See
 
 TRO and PI Hr'g Oral Argument at 39:25-41:18. The court found Mr. Ley's testimony as a fact witness to be credible based on his demeanor and his experience in the fresh tomato industry.
 
 See
 
 TRO and PI Hr'g Oral Argument at 34:20; Ley Decl. ¶¶ 1-2. Mr. Ley explained that following Commerce's withdrawal from the 2013 Suspension Agreement, the fresh tomato import/export industry has experienced difficulty servicing contracts, keeping contracts in place, filling orders, and providing tomatoes.
 
 See
 
 TRO and PI Hr'g Oral Argument at 38:58-39:14; Ley Decl. ¶¶ 1-2. Mr. Ley added that 35 percent of Mexican tomato growers were ending the growing season early and 20 percent of Mexican tomato growers were shifting from tomatoes to other crops.
 
 See
 
 Ley Decl. ¶ 5. Mr. Ley stated that as a result of the early end of the tomato harvest and the shift to other crops, tomato growers would suffer lost sales and Mexican employees would lose their jobs.
 
 See
 
 Ley Decl. ¶ 6. Mr. Ureta, the President of SPT, stated that many of SPT's members have not been able to post the required
 
 *1400
 
 bonds and many of SPT's members "have given up on selling to the U.S. market" due to the cash deposit requirement. Ureta Decl. ¶¶ 1-2.
 
 [3]
 

 Plaintiffs' business decisions to forgo selling in the United States market, end their growing season, or switch production to other agricultural crops are insufficient evidence to establish irreparable harm in this action.
 
 Compare
 

 Corus Group PLC v. Bush
 
 ,
 
 26 C.I.T. 937
 
 , 944,
 
 217 F. Supp. 2d 1347
 
 , 1355 (2002) (considering the argument that "sound business principles would require it to close ... rather than operate at a loss" and finding insufficient evidence of the danger of imminent closure)
 
 with
 

 U.S. Auto Parts Network, Inc. v. United States
 
 , 42 CIT ----, ----,
 
 319 F. Supp. 3d 1303
 
 , 1308 (2018) (finding irreparable harm when Plaintiff's financial records demonstrated the company would have been able to meet a bond requirement for "at best, a couple weeks" before going out of business).
 

 The court finds that Plaintiffs' evidence concerning lost sales is supported by mere generalized statements as to trends in the industry and estimated percentages of growers, importers, and exporters affected, and that Plaintiffs' evidence regarding lost sales is unspecific and inconclusive as to the immediate, irreparable harm Plaintiffs will suffer absent injunctive relief.
 

 In regard to the loss of export volume, Plaintiffs submitted,
 
 inter alia
 
 , the declarations of Mr. Diaz, Mr. Valdez, and Mr. Manson. Mr. Diaz, the Director of AMHPAC, stated that 46 percent of AMHPAC's membership did not have a bond in place, 24 percent of AMHPAC's membership had "experienced moderate to severe disruption in their normal business operations," 43 percent of AMHPAC's membership had reduced shipments to the United States, and 10 percent of AMHPAC's membership stopped shipping to the United States. Diaz Decl. ¶¶ 1-5. Mr. Valdez, the President of CABC, stated that 89 percent of the tomato producers in CABC's membership have not been able to secure bonds required for import into the United States, 21 percent of CABC's membership stopped shipping to the United States, and some of CABC's members are unable to renew lines of credit from those businesses' "long-standing" lenders in Mexico. Valdez Decl. ¶¶ 1-4.
 

 Mr. Manson is President of Pacific Brokerage Company, Inc. and a licensed Customs broker. Manson Decl. ¶ 1. Mr. Manson declared that he processes the Customs entries for twelve of the "largest" Mexican tomato growers and helps those entities to secure the required bonds and accounts to process payments of cash deposits.
 
 Id.
 
 at ¶ 2. Mr. Manson stated that "[c]ollateralization of either or both bonds is extremely difficult in the current environment of very high tariffs on many products" and that "[t]he surety my company uses for bonds has required 100% collateral for all except one company."
 
 Id.
 
 at ¶¶ 3-4.
 
 [4]
 
 Mr. Manson also declared
 
 *1401
 
 that based on Mr. Manson's conversations with other Customs brokers, Mr. Manson "understand[s] that about one-third of Mexican growers have reduced volumes and the remaining two-thirds have stopped shipping."
 
 Id.
 
 at ¶ 5.
 

 Plaintiffs' evidence fails to connect the cash deposit or bond requirement and the attendant circumstances of that requirement with specific and substantiated information regarding the ultimate consequences to Plaintiffs' business operations. Plaintiffs' evidence is unspecific regarding the nature and consequences of the business disruptions. Upon review of all Plaintiffs' evidence concerning the loss of export volume, the court concludes that Plaintiffs have not met their burden to show how loss of export volume constitutes irreparable harm.
 
 See also
 

 Harmoni Int'l Spice
 
 , 41 CIT at ----,
 
 211 F. Supp. 3d at 1307
 
 (discussing that loss of business may be irreparable harm if it would deprive the movant of meaningful judicial review).
 

 Second, the court considers Plaintiffs' assertions as to loss of goodwill and loss of business opportunities. In support, Plaintiffs offered,
 
 inter alia
 
 , the declaration of Mr. Jamie Chamberlain, the President of Chamberlain Distributing Inc. ("Chamberlain Distributing"), which is an importer of Mexican tomatoes, and the declaration of Mr. Escalante, the Director of CAADES's Vegetable Division, as well as the declaration and testimony of Mr. Ley. Chamberlain Decl. ¶ 1; Escalante Decl. ¶ 1;
 
 see
 
 TRO and PI Hr'g Oral Argument at 40:27-40:45; Ley Decl. ¶ 10. Mr. Chamberlain stated that the implementation of a 17.56 percent cash deposit duty on fresh tomatoes from Mexico caused his company to stop importing Mexican tomatoes. Chamberlain Decl. ¶¶ 1-3. As an example of lost business opportunities, Plaintiffs offer that Chamberlain Distributing had contracts with customers to receive tomatoes until the end of May, and that as a result, Chamberlain Distributing had to cancel those commitments.
 
 Id.
 
 at ¶ 6.
 
 [5]
 

 Mr. Escalante stated that 33 percent of CAADES's membership "experienced difficulties" securing bonds required to import fresh tomatoes into the United States, 21 percent of CAADES's membership reduced shipments to the United States, 23 percent of CAADES's membership stopped shipping to the United States and ended their export season two months early, and 43 percent of CAADES's membership was "in high risk of losing their contracts." Escalante Decl. ¶¶ 1-5.
 

 Mr. Ley testified that he believed that for every ten contracts held by Mexican tomato producers, he estimated that four were being re-negotiated and six were being terminated as parties to the contracts sought "escape" clauses or were "walking away" from the contracts.
 
 See
 
 TRO and PI Hr'g Oral Argument at 40:27-40:45; Ley Decl. ¶ 10. Mr. Ley noted that these contractual relationships take years of work for businesses to obtain certification and qualification with buyers.
 
 See
 
 TRO and PI Hr'g Oral Argument at 40:45-41:18. Mr. Ley also stated that tomato growers who import 15 loads or less of fresh tomatoes per week account for approximately 90 percent of the Mexican tomato growers, and that Mr. Ley believed that many growers who import 15 loads of fresh tomatoes per week are unable to secure a bond.
 
 See
 
 TRO and PI Hr'g Oral Argument
 
 *1402
 
 at 40:27-40:45; Ley Decl. ¶ 4.
 
 [6]
 

 The court finds that Mr. Escalante's concern that CAADES's membership is "in high risk of losing their contracts" is too uncertain to show that such a consequence will occur absent a TRO or PI, and Mr. Escalante's concern is not sufficiently supported by Plaintiffs' other evidence. Mr. Ley's testimony that at least some percentage of contracts are being re-negotiated also suggests that at least some industry participants are seeking interim solutions, which weighs against Plaintiffs' contention of irreparable harm. The court concludes that Plaintiffs' evidence regarding loss of goodwill and loss of business opportunities is insufficient and too speculative to meet Plaintiffs' burden regarding irreparable harm.
 

 Fourth, the court considers Plaintiffs' assertions regarding market disruptions and disruptions in the supply chain. Pls.' Reply 2-3. In support, Plaintiffs submit,
 
 inter alia
 
 , a memorandum from Dr. Timothy J. Richards and a University of Arizona Study Summary. The first exhibit is Dr. Richards' memorandum, which discusses the economic impact of restricting tomato imports into the United States. Richards Mem. 1-3. Dr. Richards' memorandum discusses a study that attempts to model the possible price effects assuming various reductions in tomato supply from Mexico.
 
 Id.
 
 Dr. Richards' memorandum states that "[t]erminating the suspension agreement will reduce the supply of tomatoes in the [United States] market, and raise prices paid by consumers in the [United States], particularly during the winter tomato season (October - June). The exact extent of these effects depends on the sensitivity of prices to changes in supply." Richards Mem. 1.
 

 In considering Dr. Richards' memorandum, the court notes that Dr. Richards' memorandum appears to be written in Dr. Richards' capacity at Badger Metrics, LLC, to the President of the Fresh Produce Association of the Americas. Dr. Richards did not appear in person to testify before the court about his memorandum. Plaintiffs did not provide Dr. Richards'
 
 curriculum vitae
 
 or any other information that provides context as to the preparation of Dr. Richards' memorandum.
 
 See
 
 Koslowe Decl. (May 9, 2019).
 
 [7]
 
 It is not clear from the record whether Dr. Richards participated in the study discussed in the memorandum, whether Dr. Richards is merely summarizing the results of another entity's study, or if Dr. Richards is conducting an analysis based on a model or data from another entity. Without further record evidence or the testimony of Dr. Richards, the court cannot assess whether the discussion and conclusions in Dr. Richards' memorandum are valid or reliable.
 
 See generally
 
 Fed. R. Evid. 702. The court concludes that Dr. Richards' memorandum adds little weight to Plaintiffs' arguments regarding irreparable harm.
 

 Plaintiffs also submitted a two-page summary of a study conducted by the University of Arizona, which discusses the
 
 *1403
 
 contribution of Mexican fresh tomatoes to the United States economy.
 
 See
 
 University of Arizona Study Summary. Plaintiffs proffer that the court may infer from Dr. Richards' Memorandum and the University of Arizona Study Summary that "the broader U.S. economy would suffer significant harm if Commerce imposes duties" and "[t]he reduction in imports that will be caused by the termination of the agreement, as modeled in the ASU study, would have a clear disruptive impact throughout the supply chain." Koslowe Decl. (May 9, 2019), ¶¶ 6-7.
 
 [8]
 

 As an example, Plaintiffs submitted the declaration of Mr. Mojardin, the Research Programs Coordinator at CAADES. Mojardin Decl. ¶ 1. Mr. Mojardin declared that he visited a Walmart Supercenter in Foothills Mall in Tucson, Arizona on May 10, 2019, and that the store had no tomatoes from Mexico on display.
 
 Id.
 
 at ¶ 3. Mr. Mojardin reports that he asked two store clerks if there was a specific reason as to why the store did not have any tomatoes, and a store clerk replied that he did not have any information.
 
 Id.
 
 at ¶ 5. In the absence of a sufficient causal connection between the shortage of tomatoes asserted in Mr. Mojardin's declaration and the alleged irreparable harm from the Government's withdrawal from the suspension agreement and resumption of the investigation at issue in this case, the court does not draw any inference regarding irreparable harm from Mr. Mojardin's example.
 

 Defendant counters that Plaintiffs presented no evidence that Commerce's instructions, issued after a party's withdrawal from the 2002, 2008, and 2013 Suspension Agreements, caused widespread disruption in the fresh tomato market.
 
 See
 
 Def.'s Suppl. Br. 4, May 17, 2019, ECF No. 28.
 

 Plaintiffs' motion for a TRO and PI also addresses the burden incurred by the requirement to collect and submit data in relation to the expedited continued investigation over a period of weeks versus a period of months. Pls.' Mot. for TRO and PI 7.
 
 [9]
 
 The court concludes that Plaintiffs have not sufficiently shown that the burdens identified by Plaintiffs support a determination of irreparable harm.
 

 Although the court acknowledges the potential disruptions to the fresh tomato market and supply chain alleged by Plaintiffs in this matter, the court concludes that Plaintiffs' evidence fails to meet the high burden required to show irreparable harm and that injunctive relief is warranted. Plaintiffs' evidence, when viewed in its totality, is insufficient to support a determination of irreparable harm absent injunctive relief.
 

 *1404
 

 C. Balance of Hardships
 

 Plaintiffs contend that the balance of hardships tips in Plaintiffs' favor because Plaintiffs "face irreparable harm" and argue that their requested injunction would maintain the
 
 status quo.
 
 Pls.' Mem. 10 (discussing the balance of the equities). Defendant disputes Plaintiffs' assertions of irreparable harm and argues that Plaintiffs have no vested right to import merchandise into the United States, that the United States may suffer hardship in the collection of duties, and that Plaintiffs suffer no hardship by being subject to "an ordinary consequence of the statutory scheme." Def.'s Mem. 25. Defendant-Intervenor adds that the domestic industry would suffer hardships if an injunction were granted and argues that the hardships to Defendant and the domestic industry outweigh Plaintiffs' hardships.
 
 See
 
 FTE's Resp. 22-23.
 
 [10]
 

 When assessing the balance of hardships, the court must "balance the competing claims of injury and must consider the effect that granting or denying relief would have on each party."
 
 Winter
 
 ,
 
 555 U.S. at 24
 
 ,
 
 129 S.Ct. 365
 
 . The court notes that Plaintiffs' requested injunctive relief would exceed the
 
 status quo.
 
 Plaintiffs seek to enjoin Commerce from ordering suspension of the liquidation of entries of fresh tomatoes from Mexico, resuming its antidumping investigation, and instructing U.S. Customs and Border Protection to require a cash deposit or bond for each entry of tomatoes. Pls.' Mot. for TRO and PI 1. Each of the actions challenged by Plaintiffs is required under 19 U.S.C. §§ 1673b and 1673d, thus issuance of the requested relief in an injunction would suspend the effect of the statute in this matter. The court determines that Defendant and Defendant-Intervenor would face hardship as a result of the injunction. Absent further justification by Plaintiffs, the balance of the hardships tips in favor of denying Plaintiffs' motion.
 
 [11]
 

 D. Public Interest
 

 Plaintiffs argue that a TRO or PI is in the public interest because the public interest is served by ensuring compliance with Commerce's governing statutes and regulations, and Plaintiffs believe that Commerce's actions will have a negative effect on consumers and the economy. Pls.' Mem. 10-11. Defendant counters that an injunction does not serve the public interest because an injunction would encourage circumvention of antidumping and countervailing duties investigations, would provide Plaintiffs prematurely with the advantages of a final favorable adjudication of the action, and would not serve the public interest by providing a supply of fresh tomatoes from Mexico. Def.'s Resp. at 26-27. Defendant-Intervenor adds that the public interest is best served by the effective enforcement of the trade laws, including the resumption of a suspended antidumping duty investigation and correct collection of antidumping duties. FTE's Resp. at 23-24. The public interest is neutral and does not favor one party or another.
 

 *1405
 

 IV. Conclusion
 

 The court has subject-matter jurisdiction under
 
 28 U.S.C. § 1581
 
 (i). In consideration of Plaintiffs' motion for a TRO and PI, the court determines that Plaintiffs have not met their burden to establish a likelihood of success on the merits and irreparable harm absent injunctive relief, the balance of the hardships tips in favor of denying Plaintiffs' motion, and the public interest is neutral. Plaintiffs' motion for a TRO and PI is denied.
 

 An order will issue accordingly.
 

 [1]
 

 Judge: Do you believe that there is a basis for any party to withdraw from the Suspension Agreement, just on voluntary withdrawal?
 

 Mr. Koslowe: Yes, there is. And we don't challenge that. The Agreement itself says on 90 days written notice either side can withdraw.
 

 Judge: And there doesn't have to be a violation, or-?
 

 Mr. Koslowe: Nope.
 

 Judge:-a finding that it doesn't meet the requirements of the Act?
 

 Mr. Koslowe: No.
 

 TRO and PI Hr'g Oral Argument at 10:05-10:30.
 

 [2]
 

 See
 
 Ley Decl., May 15, 2019, ECF No. 23-1 ("Ley Decl."); Diaz Decl., May 17, 2019, ECF No. 27-1 ("Diaz Decl."); Escalante Decl., May 17, 2019, ECF No. 27-2 ("Escalante Decl."); Valdez Decl., May 17, 2019, ECF No. 27-3 ("Valdez Decl."); Ureta Decl., May 17, 2019, ECF No. 27-4 ("Ureta Decl."); Mojardin Decl., May 17, 2019, ECF No. 27-5 ("Mojardin Decl."); Manson Decl., May 17, 2019, ECF No. 27-6 ("Manson Decl."); Chamberlain Decl., May 17, 2019, ECF No. 27-7 ("Chamberlain Decl."); Koslowe Decl., May 9, 2019, ECF No. 10 ("Koslowe Decl. (May 9, 2019)"); Koslowe Decl., May 28, 2019, ECF No. 33-1 ("Koslowe Decl. (May 28, 2019)"); Mem. from Dr. Timothy J. Richards, PhD, Badger Metrics, LLC, to Lance Jungmeyer, Fresh Produce Association of the Americas (Apr. 22, 2019) ("Richards Mem."), Koslow Decl. (May 9, 2019) Ex. 1, May 9, 2019, ECF No. 10-1; Dari Duval, Ashley K. Bickel, & George Fisvold,
 
 Mexican Fresh Tomatoes: Agribusiness Value Chain Contributions to the U.S. Economy
 
 , Dep't of Agricultural & Resource Economics, University of Arizona Cooperative Extension (Nov. 2018), Koslowe Decl. (May 9, 2019) Ex. 2, May 9, 2019, ECF No. 10-2 ("University of Arizona Study Summary"); Rajesh Kumar Singh,
 
 A tax on a tax: U.S. customs demands bigger bonds as trade tariffs rise
 
 , Reuters, Mar. 29, 2019, Pls.' Reply, Ex. 1, May 15, 2019, ECF No. 23-2; letter from Robert S. LaRussa and Thomas B. Wilner, counsel for CAADES, CABC, AMHPAC, UARS, and CNPH, to Hon. Wilbur Ross, Secretary of Commerce (Dec. 5, 2017), Pls.' Post-Hr'g Mem. Ex. 8, May 17, 2019, ECF No. 27-8; letter from Robert S. LaRussa, counsel for CAADES, CABC, AMHPAC, APHYM, and SPT to Hon. Wilbur Ross, Secretary of Commerce (Jul. 13, 2018), Pls.' Post-Hr'g Mem. Ex. 9, May 17, 2019, ECF No. 27-9; letter from Robert S. LaRussa, counsel for CAADES, CABC, AMHPAC, APHYM, and SPT to Hon. Wilbur Ross, Secretary of Commerce (Jul. 16, 2018), Pls.' Post-Hr'g Mem. Ex. 10, May 17, 2019, ECF No. 27-10; letter from Robert S. LaRussa, counsel for CAADES, CABC, AMHPAC, APHYM, and SPT to Hon. Wilbur Ross, Secretary of Commerce (Nov. 26, 2018), Pls.' Post-Hr'g Mem. Ex. 11, May 17, 2019, ECF No. 27-11; U.S. Dep't of Agriculture, Agricultural Marketing Service Shipping-Point Data for Roma Tomatoes Imported 2013-2018, Pls.' Post-Hr'g Mem. Ex. 12, May 17, 2019, ECF No. 27-12; letter from Robert S. LaRussa, counsel for CAADES, CABC, AMHPAC, APHYM, and SPT to Hon. Wilbur Ross, Secretary of Commerce (Nov. 28, 2018), Pls.' Post-Hr'g Mem. Ex. 13, May 17, 2019, ECF No. 27-13; Mem. to File from P. Lee Smith, Deputy Assistant Secretary for Policy & Negotiations, Enforcement & Compliance, Pls.' Post-Hr'g Mem. Ex. 14, May 17, 2019, ECF No. 27-14; letter from Thomas B. Wilner, counsel for CAADES, CABC, AMHPAC, APHYM, and SPT to Hon. Wilbur Ross, Secretary of Commerce (May 15, 2019), Pls.' Suppl. Mem. Ex. 1, May 28, 2019, ECF No. 33-2; Mem. from Jacob Keller and Yang J. Chun, International Trade Compliance Analysts, to Gary Taverman, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations (May 24, 2019), Pls.' Suppl. Mem. Ex. 2, May 28, 2019, ECF No. 33-3; and letter from Minoo Hatten, Program Manager, Antidumping/Countervailing Duty Operations, International Trade Administration, U.S. Dep't of Commerce, to Bioparques De Occidente, S.A. de C.V., Ceuta Produce, S.A. de C.V., Negocio Agricola San Enrique, S.A. de C.V. (May 24, 2019), Pls.' Suppl. Mem. Ex. 3, May 28, 2019, ECF No. 33-4.
 

 [3]
 

 Plaintiffs do not claim that cash deposits would constitute irreparable harm, but Plaintiffs state that "[m]ost growers simply cannot satisfy the very stringent requirements adopted for bonding. Therefore, their importers will have to comply with any cash deposit requirements."
 
 See
 
 Pls.' Reply 4, fn. 6;
 
 see also
 
 TRO and PI Hr'g Oral Argument at 19:05, May 16, 2019, ECF No. 25 ("We can get back our cash deposits - that's a financial remedy. We're not concerned about that.").
 

 [4]
 

 In supplemental briefing, Defendant clarifies that Customs "currently requires either a bond or a cash deposit." Def.'s Suppl. Br. 3 (emphasis removed);
 
 see also
 
 Def.'s Suppl. Br. Ex. 1, ¶ 1, May 17, 2019, ECF No. 28-1 ("As a result, the suspension of liquidation on Fresh Tomatoes from Mexico is reinstated and cash deposits or the posting of a bond equal to the estimated margins listed in Paragraph 3 below are now required.").
 

 [5]
 

 The court notes that neither Mr. Chamberlain nor Chamberlain Distributing Inc. is a Plaintiff or Plaintiff-Intervenor in this action.
 

 [6]
 

 Plaintiffs submitted two pieces of documentary evidence as attachments to Mr. Ley's declaration: (1) a Reuters article to support Mr. Ley's statement that "bonding requirements have surged since the Trump Administration's imposition of tariffs on imports of steel and aluminum, as well as most imports from China" and (2) a letter to Secretary Ross from a Mexican government official. Declaration of A. Martin Ley, Exs. 1 & 2, May 15, 2019, ECF Nos. 23-2 & 23-3.
 

 [7]
 

 It is not clear from the record before the court whether either or both of Dr. Richards' memorandum and the University of Arizona Study Summary was prepared in anticipation of litigation.
 

 [8]
 

 Defendant argues that because Mr. Koslowe is the Plaintiffs' attorney and offers only speculative allegations of harm, the Koslowe Declaration (May 9, 2019) is weak evidence.
 
 See
 
 Def.'s Resp. 10-14. Defendant argues also that "the declaration and attachments focus primarily on the effect of a reduction in Mexican tomatoes to United States customers and not the immediate harm to the [P]laintiffs."
 

 Id.
 

 at 13
 
 .
 

 [9]
 

 Pls.' Mot. for TRO and PI 7 ("Commerce's announced actions also will impose an immediate and significant burden on the Mexican Growers by forcing them to submit data in a few short weeks that normally is collected over several months.");
 
 but see
 
 Pls.' Reply at 4-5 ("CAADES is not complaining about submitting data to Commerce pursuant to a timely antidumping investigation. Instead, CAADES submits that it is irreparably harmed by Commerce's unlawful action in treating its outdated preliminary determination of 1996 'as if' it were made on May 7, 2019, and forcing respondents, including CAADES, to submit entirely new information for individual companies still to be selected so that Commerce can make a final determination on that new data in a few short weeks.").
 

 [10]
 

 FTE argues that the harm to the domestic industry is discernable based on the conclusions of the final determination of the Sunset Review regarding the 2013 Suspension Agreement. FTE's Resp. 22;
 
 see also
 

 Fresh Tomatoes From Mexico, Final Results of the Full Sunset Review of the Suspended Antidumping Duty Investigation
 
 ,
 
 83 Fed. Reg. 66,680
 
 , 66,681 (Dep't Commerce Dec. 27, 2018).
 

 [11]
 

 Even if Plaintiffs could meet their burden to establish irreparable harm, in the context of the balance of hardships, Plaintiffs' alleged hardships would not rise to the level to tip the balance of the hardships in favor of granting the requested injunctive relief.