[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15326
_____

D.C. Docket No. 2:11-cv-00578-JES-CM

NATIONAL PARKS CONSERVATION ASSOCIATION,
JOHN ADORNATO, III,

Plaintiffs - Appellants,

versus

U.S. DEPARTMENT OF THE INTERIOR,
NATIONAL PARK SERVICE,
U.S. FISH AND WILDLIFE SERVICE,

Defendants – Appellees,


SAFARI CLUB INTERNATIONAL,
FLORIDA WILDLIFE FEDERATION,

Intervenor–Defendants -
Appellees.

_____

No. 15-11599
_____

D.C. Docket Nos. 2:11-cv-00647-JES-CM


PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY,
SIERRA CLUB,
SOUTH FLORIDA WILDLANDS ASSOCIATION,
WILDERNESS WATCH,
BRIAN SCHERF,

                                        Plaintiffs - Appellants,


versus


SECRETARY, U.S. DEPARTMENT OF THE INTERIOR,
JONATHAN B. JARVIS,
Director, National Park Service,
DANIEL M. ASHE, Director,
U.S. Fish and Wildlife Service,

                                        Defendants – Appellees.


_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(August 31, 2016)



Before WILSON and JULIE CARNES, Circuit Judges, and MOORE,[*] District
Judge.

_____

   [*] Honorable William T. Moore, United States District Judge, for the Southern District of
Georgia, sitting by designation.

MOORE, District Judge:

This case involves the addition of approximately 112,400 acres of land ("Addition Lands") to the Big Cypress National Preserve in the State of Florida ("Original Preserve"). The Original Preserve was established by the Big Cypress National Preserve Act, 16 U.S.C. § 698f(a), and consists of over 574,000 acres. In 1988, Congress authorized the National Park Service ("NPS") to acquire the Addition Lands, which are the subject of this suit.

The Addition Lands contained approximately 244 miles of Off-Road Vehicle ("ORV") trails that were open for public use prior to their acquisition by the NPS. In 1996, the NPS closed these trails for public use once it began official administration of the Addition Lands. Also, the NPS began the process of drafting a General Management Plan ("GMP") for the Addition Lands, which included the possibility of ORV use on the existing trail network. As required by the Wilderness Act, 16 U.S.C. § 1131-1136, the NPS initially assessed the Addition Lands to determine their eligibility to be designated as wilderness under the act. Following a 2006 wilderness workshop, the NPS's initial eligibility assessment concluded that 111,601 acres could be designated as wilderness.

While developing a GMP, the NPS was also in the process of formulating a framework for an ORV trail system in the Addition Lands. The process used available maps, aerial photographs, and global positioning system ("GPS")

3

equipment to map existing trails and other disturbed areas. In addition, NPS staff conducted field investigations to assess the sustainability of the existing ORV trails, which the NPS defined as "a travel surface that can support currently planned and future uses with minimal impact to the natural systems of the area." Ultimately, the NPS determined that approximately 140 of the 244 miles of existing ORV trails met its definition of sustainable.

Prior to NPS management of either the Original Preserve or the Addition Lands, ORV use was permitted in these areas and not restricted to designated trails. In May 2009, the NPS completed a draft GMP and environmental impact statement ("EIS") entitled "Draft Management Plan/Wilderness Study/Off-Road Vehicle Management Plan/Environmental Impact Statement." The 2009 draft, which closely tracked the plan implemented for the Original Preserve, included an ORV management plan that restricted ORV use in the Addition Lands to a designated trail system. The 2009 draft also designated approximately 93,426 acres of Addition Lands as primitive backcountry, in which ORV access would be prohibited. The ORV trails were limited to a 52,431-acre parcel designated as a backcountry recreation management zone. ORV use would be allowed in this zone, but restricted to approximately 140 miles of trail.

During the public comment period, the NPS received almost 17,000 comments from agencies, Indian tribes, Florida state agencies, organizations, and

individuals. These comments ranged from support for to argument against any ORV usage in the Addition Lands, as well as varying disagreement with the NPS's assessment of those portions of the Addition Lands eligible for wilderness designation under the Wilderness Act. Some comments argued that the existing ORV trails, along with an area adjacent to the trails, were ineligible for wilderness designation based on the existence of human engineering that altered the natural landscape. In addition, the NPS received several comments contending that designating the area containing ORV trails as wilderness, which would temporarily prohibit ORV access, would severely restrict motorized access needed for emergency response, fire management, exotic species control, wildlife management, hydrogeologic restoration, and other traditional activities.

The NPS convened a second wilderness workshop in November 2009 to address the various concerns raised during the public comment period. During this second workshop, the NPS considered what wilderness-eligible Addition Lands it should recommend to the President for final designation as wilderness. As a result of the second workshop, the NPS reduced its initial recommendation that 85,862 acres of Addition Land receive the wilderness designation to only 48,130 acres.

According to NPS Management Policy, it must preserve all lands identified as wilderness-eligible until Congress decides whether to actually designate that land as wilderness. However, the NPS Director has authority to waive this policy

on a case-by-case basis. The Superintendent of Big Cypress sought such a waiver for certain lands determined to be wilderness-eligible in 2006, but not recommended for wilderness designation in 2009. In his request, the Superintendent explained that the waiver was requested for lands that "will require [] indefinite and continued active intervention in order to accomplish and maintain restoration goals related to exotic species of animals and plants as well as hydrology." In his opinion, "[a] wilderness designation of these lands would seriously affect [the NPS's] ability to take appropriate and necessary management action within these lands and over the long term." Ultimately, the Director denied the requested waiver.

Following the denial, the NPS convened a third workshop in February 2010 to assess the earlier public comments contending that certain portions of the Addition Lands, including those that formed the basis of the waiver request, were actually ineligible for wilderness designation. According to the workshop notes, the participants reviewed the previous criteria used to determine wilderness eligibility and revisited certain assumptions relied upon in the initial 2006 study. The participants agreed to use two assumptions as part of the 2010 workshop: first, the substantial imprint of human work would include roads, trails, or other areas created by man and requiring substantial human intervention for restoration; second, the viewpoint of a land manager, rather than a common visitor, would be

6

used to determine whether the imprint of human work was substantially unnoticeable.

Using these new parameters, the participants reviewed topographic maps, geographic information systems, and aerial photography, and relied on their own personal knowledge to reassess the earlier findings regarding wilderness eligibility. Based on the "lack of opportunities for solitude and the presence of human disturbance," the ORV trails and a 1/2-mile buffer around the trails were determined to be ineligible for wilderness designation. The 2010 workshop resulted in a reduction in the amount of wilderness-eligible land from 111,601 acres to 71,260 acres.

Based on the third workshop, the NPS completed its final wilderness eligibility assessment for the Addition Lands in April 2010. The final assessment carried forward the assumptions used during the 2010 workshop and determined that only 71,260 acres were eligible to be designated as wilderness, which did not include the former ORV trails and the 1/2-mile buffer. With respect to the buffer, the final assessment concluded that a 1/4-mile buffer in either direction from the trail centerline was appropriate "to accommodate environmental protection and safety considerations, such as for fire management, exotic/invasive plant and animal control, hunting and retrieval of game, and traditional uses including the gathering of native materials."

7

In October 2010, the NPS finalized its GMP and EIS for the Addition Lands. The GMP included a management plan for ORV use in the Addition Lands, which restricted such use to designated trails, provided for nightly and seasonal closures, and required ORV inspection and permitting. The GMP limited the number of ORV permits to 650 per year.

Pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1531-1544, the NPS engaged in informal consultation with the U.S. Fish and Wildlife Service ("FWS") concerning the potential impact of the Addition Lands GMP on the eastern indigo snake. The NPS conducted its own Biological Evaluation, concluding that their recommendation to allow ORV use in the Addition Lands was unlikely to adversely affect the eastern indigo snake. The FWS concurred with the NPS's conclusion.

The NPS also engaged in formal consultation with the FWS concerning the Florida panther. As a result, the FWS issued its Biological Opinion in November 2010. In this opinion, the FWS determined that the GMP is unlikely to jeopardize the continued existence of the Florida panther. Addressing the planned ORV use, the FWS stated that while recreational ORV use has been associated with alterations in panther behavior, those alterations "have not been correlated with any change in reproductive success or survival." The opinion authorized incidental loss of panthers in the form of habitat harassment, but outlined non-discretionary

8

terms and conditions with which the NPS must comply, such as collection and monitoring of panther use of the Addition Lands. The opinion also required the NPS to again formally consult with the FWS should the level of incidental loss exceed expectations.

Unhappy with the GMP, Appellant National Park Conservation Association ("NPCA") filed suit in the Middle District of Florida. In its complaint, the NPCA contended that the GMP's inclusion of ORV trails for the Addition Lands was arbitrary, capricious, and in violation of the Wilderness Act and Organic Act. Appellant Public Employees for Environmental Responsibility ("PEER") filed a separate suit in the Middle District of Florida. Similarly, this complaint alleged that the decision to allow permitted ORV use in the Addition Lands was arbitrary, capricious, and contrary to the Wilderness Act, Organic Act, and ESA. The two cases were consolidated and referred to a Magistrate Judge.

Following a de novo review of the Magistrate Judge's Report and Recommendation, the District Court concluded that the NPS did not violate the Wilderness Act, finding that the 2010 reassessment of the wilderness eligibility determination was the result of reasoned decision-making rather than political manipulation. With respect to the 1/2-mile buffer, that court determined that the NPS's rational for excluding those lands from wilderness eligibility was supported by the record. Also, the court found that the NPS did not violate the Organic Act

by failing to promote conservation because the record supported the NPS's conclusion that the existing ORV trail network retained the imprint of human engineering and would continue to handle ORV traffic from private property owners accessing their property. Finally, the District Court concluded that the NPS's Biological Evaluation and the FWS's Biological Opinion regarding the eastern indigo snake and Florida panther were supported by the record.

The NPCA argues on appeal that the NPS's wilderness assessment for the Addition Lands in Big Cypress National Park is inconsistent with the Wilderness Act such that it is arbitrary and capricious rather than the result of reasoned decision-making. In addition, the NPCA contends the NPS's determination that implementation of the GMP would not impair the Addition Lands' resources violated the Organic Act because the NPS improperly failed to consider the potential safety and other impacts of the proposed ORV trail system to existing visitor use. PEER raises the same arguments, but also maintains that both the NPS's Biological Evaluation and the FWS's Biological Opinion violated the ESA by failing to fully analyze the impacts of the ORV trail system on the eastern indigo snake and Florida panther.

**ANALYSIS**

I.    Standard of Review

Under the Administrative Procedures Act, 5 U.S.C. § 706(2), a court may

only set aside an agency's decision if it is determined to be arbitrary, capricious, an

abuse of discretion, or contrary to law. A decision is arbitrary and capricious

> "where the agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an important aspect
> of the problem, offered an explanation for its decision that runs
> counter to the evidence before the agency, or is so implausible that it
> could not be ascribed to a difference in view or the product of agency
> expertise."

*Defenders of Wildlife v. United States Dep't of the Navy*, 733 F.3d 1106, 1115

(11th Cir. 2013) (*quoting Miccosukee Tribe of Indians of Fla. v. United States*, 566

F.3d 1257, 1264 (11th Cir. 2009)). This standard is exceedingly deferential,

prohibiting a court from substituting its judgment for the agency's decision. *Sierra*

*Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008). Moreover, courts are

required to defer to conclusions reached by an agency that are bases on its

specialized expertise. *City of Oxford v. FAA*, 428 F.3d 1346, 1352 (11th Cir. 2005)

(*citing N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538-39 (11th Cir.

1990)).

However, the reviewing court must consider whether the record contains

substantial evidence in support of an agency decision. 5 U.S.C. § 706(2)(E).

Substantial evidence is " 'relevant evidence [that] a reasonable mind might accept

as adequate to support a conclusion.' " *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1133 (11th Cir. 2012) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)). This standard precludes a reviewing court from "deciding the facts anew, making credibility determinations, or re-weighing the evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam). The ability to find adequate support in the record for a contrary conclusion is insufficient to overturn an agency's factual conclusion. *DeKalb Cty. v. U.S. Dep't of Labor*, 812 F.3d 1015, 1020 (11th Cir. 2016).

## II.    Wilderness Act

In this case, Appellants argue that the NPS's adoption of a heightened standard for determining whether, under the Wilderness Act, the ORV trails were wilderness-eligible was arbitrary and capricious. Appellants contend that these standards are unprecedented and rely on factors not expressed in the Wilderness Act. In addition, Appellants advance the generally unsupported accusation that the reassessment of wilderness-eligible lands was the result of political pressure by the State of Florida and advocacy groups to permit extensive ORV use in the Addition Lands. In response, Appellees maintain that the NPS did not adopt a new interpretation of the Wilderness Act, but only made certain assumptions concerning how to assess the Addition Lands' eligibility for wilderness designation.

12

The Wilderness Act defines wilderness as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c). According to statute, wilderness is an "area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions." *Id.* The only factors contained in the Wilderness Act state that eligible wilderness

> (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable;
>
> (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation;
>
> (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and
>
> (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

*Id.*

It is difficult to see how the NPS ran afoul of these statutory directives. While the factors are objective, there are a myriad of parameters that can be used to assess whether an area "generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable." *Id.* While the 2006 workshop considered trails that required significant engineering as an example of a substantial human imprint, the 2010 workshop expressed it as

13

trails "created by man and used significantly over time that would require substantial human intervention to restore." To be fair, the language is not parallel between the two workshops. Giving the NPS due deference, however, it does not appear that these are two wholly differing standards. In short, they are not so diametrically opposed to permit the Court to conclude that the NPS drastically changed its criteria with the express purpose to omit the ORV trails from wilderness eligibility.

Appellants' argument concerning the point of view from which to determine wilderness eligibility also lacks merit. Appellants assume that the 2006 workshop assessed the condition of an area from the viewpoint of the common visitor, while the 2010 workshop used the viewpoint of a land manager. First, it is not particularly clear what viewpoint participants utilized in the 2006 workshop. The record is silent in that regard. Appellants only assume a common visitor viewpoint because the 2010 workshop specifically expressed it as a land manager viewpoint and not that of common visitor. Second, the language of the Wilderness Act does not express either a preference for or prohibition against the use of either viewpoint. Indeed, a reasonable application of the Wilderness Act's factors could rely on either viewpoint. Third, it seems that the use of a land manager viewpoint would be more reasonable. The Wilderness Act expresses this factor as the impact of humans being substantially unnoticeable. It is reasonable to assume that training

14

and experience is either necessary or preferred when assessing human impact on an area. Moreover, NPS policy requires a "managerial determination" as to eligibility, suggesting that a certain level of expertise should be employed when making eligibility determinations. In short, an area's eligibility for wilderness designation is a highly technical judgment that is likely to be more ably performed by an informed individual with a trained eye, rather than by a mere common visitor.

Contrary to Appellants' argument, the NPS did not require that an area be pristine and untouched by humans to be found wilderness-eligible. The record shows that the NPS required the area to be free of any substantially noticeable human imprint, which is what is required under the Wilderness Act. Given the NPS's technical expertise and the evidence in the record, this Court concludes the NPS's determination that the former ORV trails, along with the 1/2-mile buffer, contains a substantially noticeable human imprint is the result of reasoned decision-making, and not arbitrary and capricious.

Finally, there is no indication in the record that the NPS conducted the reassessment simply to appease the State of Florida and special interest groups. Agency decisions are entitled to a presumption of regularity. *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1216 (11th Cir. 2012) (*quoting Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*, 772 F.2d 700, 708 (11th Cir. 1985)). Absent evidence in the record, this Court is unwilling to ascribe

15

some improper motive to the NPS's decision to reassess the wilderness eligibility

of the Addition Lands. Appellants point to no substantial evidence suggesting that

the NPS caved to these groups. Rather, Appellants simply point to public

comments that the ORV trails should be ineligible and the subsequent reassessment

by the NPS. However, it is entirely expected that some of the 17,000 comments

would contend that the area should not be designated as wilderness. The NPS is

free to take to heart those comments and reassess its initial findings should it see

fit.

III.    Organic Act

Appellants argue that the NPS violated the Organic Act by failing to account

for the impairment of visitor experience by the ORV trail system. Also, Appellants

contend that the NPS violated the Organic Act by elevating recreational use above

preservation. In response, Appellees maintain that the Organic Act does not

include visitor experience as a factor that must be considered when creating a

GMP. In addition, Appellees deny that the GMP for the Addition Lands

impermissibly elevated recreation over conservation.

In interpreting the Organic Act's non-impairment provision, NPS

Management Policies provides that the fundamental purpose of the park system is

to conserve park resources and values. The Management Policies further provide

that "when there is a conflict between conserving resources and providing for

16

enjoyment of them, conservation is to be predominant." Agency decisions that fail to promote conservation over recreation run contrary to the express directives of Congress and cannot be upheld.

The record in this case does not establish that the GMP improperly advanced recreational use over conservation of resources in the Addition Lands. The NPS analyzed the impact of the proposed ORV use on numerous conservation issues, and adopted measures to minimize and mitigate environmental harm. In addition, the GMP provides for adaptive management of Addition Lands by restricting ORV capacity as necessary to avoid negative impacts on the environment. The record more than supports Appellees' claim that, relying on the NPS's expertise in the field, the limited recreational use promoted by the GMP would not cause unacceptable environmental impairments or impacts. Moreover, the Addition Act permits the NPS to allow "traditional recreational opportunities," 16 U.S.C. § 698m-2, so long as "that use will not cause impairment or unacceptable impacts" Based on the evidence in the record and giving due deference, there is no basis for concluding that the GMP's inclusion of the ORV trail system is arbitrary and capricious.

With respect to visitor experience, Appellees are correct in their argument that visitor experience is not a park resource or value that must be considered when assessing an activity's impact. In arriving at this conclusion, the NPS reasonably

interpreted its Management Policies and Interim Guidance. The Interim Guidance does identify "appropriate opportunities to experience enjoyment of . . . resources, to the extent that can be done without impairing them." Giving the NPS appropriate deference, it is a reasonable interpretation that the Interim Guidance only requires visitors to have the opportunity to enjoy park resources, but does not mandate any specific level of enjoyment. Therefore, Appellants' argument that the GMP impermissibly failed to assess the impact of the ORV trails to visitor experience and non-ORV user safety lacks merit.

IV.    Endangered Species Act

Appellant PEER argues that the NPS and FWS violated the ESA by failing to engage in formal consultation regarding the eastern indigo snake. Also, Appellant PEER contends that the FWS failed to properly analyze the impacts of ORV use on the endangered Florida panther. In response, Appellees maintain that the NPS and FWS were not required to engage in formal consultation regarding the eastern indigo snake because they concluded that ORV use was not likely to adversely affect that species. With respect to the Florida panther, Appellees point to evidence in the record establishing that ORV use is unlikely to jeopardize the continued existence of the Florida panther, as well as the inclusion of a sufficient trigger in the Biological Opinion for the reinitiation of formal consultation based on incidental loss of habitat.

18

The ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy critical habitat. 16 U.S.C. § 1536(a)(2). To implement this directive, federal agencies must informally consult with the FWS where an action may affect a listed species or its critical habitat. 50 C.F.R. § 402.14(a). Should an agency and the FWS determine that an action is not likely to have an adverse effect, no further action is required. *Id.* § 402.13(a). If further formal consultation is required, the agency and the FWS prepare a Biological Opinion advising the agency whether a listed species is likely to be jeopardized, along with possible reasonable and prudent alternatives to the proposed action. *Id.* § 402.14(h)(3).

The record in this case supports the NPS's and FWS's determination that formal consultation with respect to the eastern indigo snake was not required based on the lack of adverse effects posed by ORV use. Appellees correctly point to the NPS's and FWS's findings that while ORV use could alter eastern indigo snake behavior, any disruption would be negligible and not result in death or injury of any individual snakes. Because there is no likelihood of any measurable impact, formal consultation was not required. Affording the NPS's and FWS's conclusions due deference, their decision to forego formal consultation is not a violation of the ESA.

19

Similarly, the record supports the NPS and FWS's Biological Opinion that ORV use was unlikely to jeopardize the Florida panther's continued existence. The Biological Opinion did state that the ORV trails, along with their 1/2-mile buffer, would result in 16,808 acres of suitable habitat being seasonally affected. However, the NPS and FWS relied on several scientific studies suggesting that Florida panthers are likely to seasonally avoid this habitat due to other causes, such as movement of prey, habitat composition, or hydrology. In any event, the Biological Opinion concluded that any migration away from ORV trails would have minor to no biological consequences. Deferring to the NPS and FWS's judgment, those agencies appropriately analyzed the effects of ORV use on the existing Florida panther population.

Finally, Appellant PEER incorrectly states that the Biological Opinion fails to include an appropriate trigger for reinitiation of formal consultation. This argument appears to rely on an amended version of C.F.R. § 402.14(i)(1)(i), which requires a clear standard for determining when the level of incidental loss has been exceeded. The regulation in place at the time the Biological Opinion was generated only required a statement specifying the impact of incidental loss. This prior version has been interpreted to permit the use of a trigger expressed in terms other than actual population loss where using actual population loss would be impractical. *Miccosukee Tribe*, 566 F.3d at 1275 ("We apply instead the rule that

20

specific population data is required unless it is impractical."). In this case, the NPS and FWS used habitat loss as the appropriate trigger based on the impracticality of maintaining an accurate population count of Florida panthers. Appellant PEER does not contest the impracticality of maintaining such a count. Because there is no evidence in the record to the contrary, the NPS and FWS's use of habitat loss as the sufficient trigger is reasonable and their decision comports with the ESA.

## CONCLUSION

In the final analysis, Appellants' arguments can be reduced to a disagreement regarding the NPS's and FWS's ultimate conclusions. It is unsurprising that reasonable minds can differ regarding the interpretation of the copious amount of data upon which the NPS and FWS relied when making their decisions. However, it is clear to this Court that the record contains substantial evidence to support those conclusions. As a result, it is beyond the power of Appellants and this Court to second guess these agencies' reasoned decision-making. Accordingly, the judgment of the district court is **AFFIRMED**.

21