# United States Court of Appeals for the Federal Circuit

---

**CONFEDERACION DE ASOCIACIONES AGRICOLAS DEL ESTADO DE SINALOA, A.C., CONSEJO AGRICOLA DE BAJA CALIFORNIA, A.C., ASOCIACION MEXICANA DE HORTICULTURA PROTEGIDA, A.C., ASOCIACION DE PRODUCTORES DE HORTALIZAS DEL YAQUI Y MAYO, SISTEMA PRODUCTO TOMATE,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, FLORIDA TOMATO EXCHANGE,**
*Defendants-Appellees*

---

2020-2232, 2020-2299, 2020-2300

---

Appeals from the United States Court of International Trade in Nos. 1:19-cv-00203-JCG, 1:19-cv-00206-JCG, 1:20-cv-00036-JCG, Judge Jennifer Choe-Groves.

---

Decided:  April 14, 2022

---

DEVIN S. SIKES, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by SPENCER STEWART GRIFFITH, YUJIN KIM MCNAMARA. Also argued by JAMES P. DURLING, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington DC; JEFFREY M. WINTON, Winton & Chapman PLLC,

Washington, DC.

DOUGLAS GLENN EDELSCHICK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also argued by ROBERT R. KIEPURA. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, FRANKLIN E. WHITE, JR.; EMMA T. HUNTER, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, Washington, DC.

MARY JANE ALVES, Cassidy Levy Kent USA LLP, Washington, DC, argued for defendant-appellee Florida Tomato Exchange. Also represented by JAMES R. CANNON, JR., ULRIKA K. SWANSON, JONATHAN M. ZIELINSKI.

---

Before DYK, PROST, and TARANTO, *Circuit Judges.*

DYK, *Circuit Judge.*

Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C.; Consejo Agricola De Baja California, A.C.; Asociacion Mexicana de Horticultura Protegida, A.C.; Asociacion de Productores de Hortalizas del Yaqui y Mayo; and Sistema Producto Tomate (collectively "CAADES" or "the growers") appeal a final decision of the Court of International Trade (the "Trade Court"). The Trade Court dismissed CAADES's claims as either being moot or not ripe, though characterizing the dismissal as being for failure to state a claim.

We hold that we have jurisdiction over CAADES's challenges to the government's termination of the parties' 2013 suspension agreement ("the 2013 agreement") and the 2019 suspension agreement ("the 2019 agreement") and that those claims are not moot. However, on the merits we conclude that the 2013 agreement's termination was not invalid for failing to comply with statutory termination

requirements or because of allegedly improper political influence and that the 2019 agreement is not invalid on grounds of duress.

As for CAADES's claims that the October 2019 final antidumping determination is invalid, we conclude that the challenge is not premature and that the Trade Court has jurisdiction to hear those claims. We remand for further proceedings pursuant to our opinions in *Bioparques de Occidente v. United States*, No. 2020-2265, and *Red Sun Farms v. United States*, No. 2020-2230.

BACKGROUND

I.  History of the Tomato Investigations and Suspension Agreements

This appeal arises out of a less-than-fair-value investigation concerning fresh tomatoes from Mexico. In April 1996, the Department of Commerce ("Commerce") began an antidumping duty investigation to determine whether Mexican tomatoes were being imported into the United States and sold at less than fair value. After Commerce issued a preliminary affirmative dumping determination, Commerce and the exporters responsible for substantially all of the imports of fresh tomatoes from Mexico negotiated and entered into a 1996 agreement (pursuant to 19 U.S.C. § 1673c(c)) that suspended the investigation, terminated the collection of cash deposits or bonds, and ended the suspension of liquidation of entries of the subject tomatoes.

So began a cycle in the more-than-two decades that followed, in which old agreements were terminated and new agreements were executed. The growers withdrew from the 1996 suspension agreement in 2002, which led to a new agreement that same year, then withdrew from the 2002 agreement in 2007, which led to a new agreement the following year, then withdrew from the 2008 agreement in 2013, which led to a new agreement the same year. The

terms of the parties' past suspension agreements were similar—the one notable exception being that the 2013 agreement was the first to include a clause permitting either party to withdraw from the agreement at will upon ninety days' notice.  Previous agreements permitted only the growers to withdraw from the agreement without cause.[1] For the first time, the agreement, in section VI.B, provided: "The signatories *or the Department* may withdraw from this Agreement upon ninety days written notice to the other party."  J.A. 353 (emphasis added).

## II.  Commerce's Termination of the 2013 Agreement

In November 2018, the Florida Tomato Exchange ("FTE")—a group representing U.S.-based tomato growers and distributors—sent a letter to Commerce requesting that Commerce terminate the 2013 suspension agreement under section VI.B's withdrawal clause and resume the antidumping investigation.  The FTE alleged that the agreement had not effectively eliminated dumping.  Forty-eight members of Congress, led by Florida Senator Marco Rubio, subsequently signed on to a February 1, 2019, letter that also urged Commerce to terminate the agreement for the same reasons.

Five days later, Commerce notified the Mexican growers that it intended to withdraw pursuant to section VI.B, and indicated that it would resume its antidumping investigation if the parties failed to reach a new agreement by May 7, 2019. When the parties missed that deadline, Commerce resumed its investigation and re-imposed cash deposit requirements on imported Mexican tomatoes.  During the resumed investigation, Commerce issued a July 2019 preliminary dumping determination.  CAADES alleges

---

[1]    The majority of the grower-signatories remained the same during the 1996–2013 suspension agreement proceedings.

that the cash deposit requirements resulted in severe financial strain for many of its members, causing several of them to go out of business. It was under these alleged financially-strained conditions that CAADES and the agreement's other signatories negotiated a new suspension agreement.

On September 19, 2019, more than seven months after Commerce withdrew from the 2013 agreement, the parties executed a new agreement. Like past agreements, the 2019 agreement suspended the underlying antidumping investigation and terminated Commerce's cash deposit requirement, and the signatories agreed to sell the imported subject tomatoes at or above a minimum reference price. It also allowed both the government and the Mexican growers to withdraw at any time with ninety days' notice. No party has withdrawn from the 2019 agreement.

### III. Commerce's Continued Investigation

Section 1673c(g) of Title 19 provides that Commerce may continue a suspended investigation "within 20 days after the date of publication of the notice of suspension" at the request of the foreign exporters or an interested party, which includes domestic manufacturers, producers, and wholesalers. *See* § 1677(9)(C). After the 2019 agreement took effect, the FTE asked Commerce to continue its antidumping investigation pursuant to § 1673c(g). Commerce did so, and in October 2019, it issued a final affirmative determination that increased the dumping margins for all of the subject Mexican growers and exporters over the dumping margins reflected in the July 2019 preliminary determination. An antidumping duty order incorporating these new rates could not issue while the 2019 agreement remained in place, but such an order would issue immediately if either Commerce or the signatories withdrew from the agreement. *See* § 1673c(i)(1)(C).

These combined events led CAADES to file three separate complaints in the Trade Court,[2] each of which raised identical claims that fall into three categories: (1) a challenge to Commerce's decision to terminate the 2013 agreement for allegedly violating 19 U.S.C. § 1673c(i)'s statutory requirements[3] and for being based on improper political influence, and a related challenge alleging that the resumption of the investigation following this improper termination was invalid (counts 1–3); (2) a challenge to the validity of the 2019 agreement on grounds of duress (count 4); and (3) a challenge to Commerce's final affirmative determination for failing to abide by statutory deadlines, unlawfully calculating final margins, and depriving the growers of individual rates (counts 5–7). CAADES's complaints asked the Trade Court to declare the final determination and the 2019 agreement unlawful, null, and void, and to reinstate the 2013 agreement. The government moved to dismiss on grounds of mootness, ripeness, and for failure to state a claim upon which relief can be granted.

The Trade Court granted the government's motion and dismissed CAADES's complaints "for failure to state a claim." J.A. 4. Despite the Trade Court's characterization of its dismissal as being for failure to state a claim, it concluded that the claims with respect to the 2013 and 2019

---

[2]    CAADES's complaints are identical in all respects except for the alleged jurisdictional grounds. Two of the complaints alleged that the Trade Court had jurisdiction under 28 U.S.C. § 1581(c) because the claims were reviewable under 19 U.S.C. § 1516a(a)(2)(B)(iv). All of the complaints alleged that the Trade Court had jurisdiction under 28 U.S.C. § 1581(i)(4) (now 28 U.S.C. § 1581(i)(1)(D)).

[3]    CAADES's challenge also relied on Commerce's regulation, 19 C.F.R. § 351.209(a), which is no different from the statute itself.

agreements "became moot" when CAADES "voluntar[ily] sign[ed]" the 2019 agreement, "a new agreement which superseded the [] 2013 Suspension Agreement." J.A. 17. According to the Trade Court, CAADES's decision to voluntarily enter into the 2019 agreement "undercut[] [CAADES's] assertion that Commerce unlawfully terminated the 2013 Suspension Agreement." *Id.* The Trade Court also held that CAADES could not challenge the 2019 agreement while at the same time "receiv[ing] its benefits and protections." *Id.* With respect to the final determination, the Trade Court characterized the challenge as not ripe for review because a duty order incorporating the increased dumping margins would "have no effect so long as the 2019 Suspension Agreement is in place." J.A. 19. CAADES appeals. The Trade Court had jurisdiction under the residual provision of § 1581(i)(1)(D), and we have jurisdiction to review the Trade Court's final decision pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review the Trade Court's dismissal of the complaints de novo. *Amoco Oil Co. v. United States*, 234 F.3d 1374, 1376 (Fed. Cir. 2000) (citing *Ponder v. United States*, 117 F.3d 549, 552 (Fed. Cir. 1997)). In doing so, "we must take all of the factual allegations in the complaint as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

### I.   2013 Termination Claims

### A.   Jurisdiction

We first address the claim that the 2013 agreement was improperly terminated. Neither party challenges our jurisdiction under 28 U.S.C. § 1295(a)(5) or the Trade Court's jurisdiction under 28 U.S.C. § 1581(i)'s residual clause, but we must nonetheless address this issue given our "special obligation to 'satisfy [ourself] not only of [our]

own jurisdiction, but also that of the lower court[].'" *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)).

Each of CAADES's three complaints alleged that § 1581(i)(4)'s residual jurisdiction clause (now codified as § 1581(i)(1)(D)) authorized the Trade Court's review of Commerce's termination of the 2013 agreement. That provision grants the Trade Court jurisdiction to hear "any civil action commenced against the United States . . . that arises out of any law of the United States providing for . . . administration and enforcement" of the trade laws. § 1581(i)(1)(D).

Residual jurisdiction under § 1581(i) is not available if the determination the plaintiff seeks to challenge is already reviewable by the Trade Court under § 1516a(a), or by a binational panel under § 1516a(g). § 1581(i)(2)(A), (B). The issue then, is whether either of those provisions permits the Trade Court's review of Commerce's decision to terminate a suspension agreement.

In prior, related preliminary injunction proceedings, the Trade Court held that it had jurisdiction to hear CAADES's challenges to the termination of the 2013 agreement under the residual clause in § 1581(i)(1)(D) because "the particular agency action at issue [was] Commerce's withdrawal from the 2013 Suspension Agreement," "§ 1516a does not identify Commerce's decision to withdraw from a suspension agreement as reviewable," and the challenge "pertain[ed] to the administration and enforcement of a matter" arising out of the trade laws. *Confederacion de Asociaciones Agricolas del Estado de Sinaloa v. United States* (*CAADES I*), 389 F. Supp. 3d 1386, 1394–95 (Ct. Int'l Trade 2019).

We agree with the Trade Court's reading of the statute. A decision by Commerce to terminate a suspension agreement is absent from the list of reviewable determinations

identified in § 1516a(a)(2)(B). The termination of a suspension agreement is not a "determination . . . to suspend an antidumping duty . . . investigation," nor is it a "final determination resulting from a continued investigation" under § 1516(a)(2)(B)(iv). So too, a decision to terminate a suspension agreement is not reviewable by a binational panel under § 1516a(g), as that list of reviewable determinations refers back to § 1516a(a)(2)(B). *See* § 1516a(g)(1)(A), (B). We have jurisdiction under the residual provision.

## B.  Mootness

The Trade Court held that CAADES's challenges to the government's termination of the 2013 agreement are moot because the court lacked the ability to reinstate the 2013 agreement after the parties voluntarily entered into the 2019 agreement. On appeal, CAADES contends that its challenges to the 2013 agreement's termination are not moot because the Trade Court retained the ability to reinstate the 2013 agreement if the 2013 agreement was improperly terminated.

The mootness doctrine arises from Article III's limit on the exercise of federal judicial power to live cases and controversies. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160–61 (2016). Moot cases are those in which "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). A case becomes moot and must be dismissed only when "'it is impossible for a court to grant any effectual relief whatever' to [the plaintiff] assuming it prevails." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). If "there is any chance" a court can grant the plaintiff's requested relief if it prevails on the merits, no matter how

"uncertain or even unlikely" that chance may be, the "suit remains live." *Id.*

We reject the Trade Court's characterization of the claims as moot; if the growers were to prevail on their claims relating to the termination of the 2013 agreement and their contentions concerning the appropriate relief, the Trade Court could reinstate the 2013 agreement. *See CSC Sugar LLC v. United States*, 413 F. Supp. 3d 1318, 1326 (Ct. Int'l Trade 2019) (vacating amendment to suspension agreement because notice and comment process "substantially prejudiced" the challenger). The government did not sustain its "heavy" burden to establish mootness, *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)), and it was improper for the Trade Court to dismiss these claims on grounds of mootness.

## C.   The Merits

We next consider the merits of CAADES's claims that the 2013 agreement was improperly terminated. The Trade Court appears to have concluded that CAADES failed to state a claim for improper termination of the 2013 agreement because the 2019 agreement was a replacement agreement that superseded the 2013 agreement and barred any challenge to the 2013 agreement. We note that the terms of the 2019 agreement do not state that the parties surrendered their ability to sue for improper termination of the 2013 agreement by entering into the 2019 agreement. But we need not decide whether entering into the 2019 agreement implicitly foreclosed CAADES's challenges to the 2013 agreement's termination because those challenges independently fail on the merits.

1

In support of its argument that the government improperly terminated the 2013 agreement, CAADES

contends that the government lacked the authority to terminate the 2013 agreement because it failed to make "either of the determinations required by . . . 19 U.S.C. § 1673c(i), and by 19 C.F.R. § 351.209(a)" prior to termination. J.A. 74. Section 1673c(i) provides that Commerce "shall" withdraw from a suspension agreement if it finds that the agreement "is being, or has been, violated, or no longer meets the requirements of" § 1673c(b) or (c),[4] and if

---

[4]   The 2013 agreement was issued pursuant to § 1673c(c), which requires agreements eliminating injurious effect to satisfy the following factors:

(1) General rule

If the administering authority determines that extraordinary circumstances are present in a case, it may suspend an investigation upon the acceptance of an agreement to revise prices from exporters of the subject merchandise who account for substantially all of the imports of that merchandise into the United States, if the agreement will eliminate completely the injurious effect of exports to the United States of that merchandise and if—

(A) the suppression or undercutting of price levels of domestic products by imports of that merchandise will be prevented, and

(B) for each entry of each exporter the amount by which the estimated normal value exceeds the export price (or the constructed export price) will not exceed 15 percent of the weighted average amount by which the estimated normal value exceeded the export price (or the constructed export price) for all less-than-fair-value

the agreement also fails to meet the requirements of § 1673c(d).[5]    The requirements of the regulation, § 351.209(a), are no different.  Termination is required if the agreement fails to remedy price discrimination found by the agency in a preliminary or final determination.

But Commerce here based its withdrawal from the 2013 suspension agreement not on § 1673c(i), but on section VI.B of the 2013 agreement.  The government's "general authority to make[] contracts" includes the "power to choose with whom and upon what terms the contract[] will be made . . . unless Congress has placed some limit on it." *Arizona v. California*, 373 U.S. 546, 580 (1963), *abrogated in part on other grounds by California v. United States*, 438 U.S. 645, 673–74 (1978); *see also United States v. Winstar Corp.*, 518 U.S. 839, 884 (1996) ("[T]he Government's practical capacity to make contracts . . . [is] 'the essence of sovereignty' itself." (quoting *United States v. Bekins*, 304 U.S. 27, 51–52 (1938))).  In the Trade Agreements Act of 1979, Congress "narrowly circumscribed" Commerce's "authority" to enter into suspension agreements, S. Rep. 96-249, at

---

entries of the exporter examined during the course of the investigation.

[5]    Section 1673c(d) applies to all suspension agreements and imposes the following requirements:

(d) Additional rules and conditions

The administering authority may not accept an agreement under subsection (b) or (c) of this section unless—

(1) it is satisfied that suspension of the investigation is in the public interest, and

(2) effective monitoring of the agreement by the United States is practicable. . . .

71 (1979), but it did not "fetter [Commerce's] discretion" to control the content of such agreements "in clear and unequivocal terms," *Arizona*, 373 U.S. at 581, apart from the requirement that the agreement provide appropriate remedies for the dumping. *See* § 1673c(b)–(d).

Section 1673c(i) mandates Commerce's withdrawal from a suspension agreement in certain circumstances, but it does not limit Commerce's ability to contract for the right to withdraw under other circumstances. There is no other provision or policy in the antidumping statute that suggests the government lacks the authority to contract for the ability to withdraw from a suspension agreement, and CAADES cites no such provision or policy. Thus, this is not a situation in which a government contract is impermissible because it conflicts with the provisions or policies of a governing statute. *See, e.g.*, *Chamber of Com. v. Reich*, 74 F.3d 1322, 1338–39 (D.C. Cir. 1996).

This court previously rejected an identical challenge to Commerce's withdrawal from the 2013 agreement in reviewing the Trade Court's denial of a preliminary injunction in a related proceeding. *See In re Confederacion de Asociaciones Agricolas del Estado de Sinaloa*, 781 F. App'x 982 (Fed. Cir. 2019). There, CAADES sought to prevent the government from ordering the suspension of the liquidation of entries of Mexican tomatoes, resuming its antidumping investigation, and requiring cash deposits or bonds for imports following the 2013 agreement's termination.[6]  *See id.* at 984. After the government published

---

[6]    During the preliminary injunction hearing at the Trade Court, the growers conceded that Commerce's withdrawal from the 2013 Agreement was proper. *CAADES I*, 389 F. Supp. 3d at 1396 n.1 ("Judge: Do you believe that there is a basis for any party to withdraw from the Suspension Agreement, just on voluntary withdrawal? Mr.

notice that it intended to terminate the suspension agreement and resume its antidumping investigation, the growers filed suit in the Trade Court, challenging the agreement's termination. In upholding the Trade Court's denial of the growers' request for a preliminary injunction, we concluded that the "petitioners [were] unlikely to succeed on the merits of their challenge" to the 2013 agreement's termination in part because § 1673c(i)'s requirements apply only when Commerce bases its withdrawal from a suspension agreement on § 1673c(i). *Id.* at 986. The panel concluded that the government was not required to comply with § 1673c(i) because "Commerce stated that it was basing its withdrawal from the suspension agreement on the withdrawal provision," (section VI.B) "not on [§ 1673c(i)]." *Id.* Similarly here, we see no reason why Commerce's withdrawal from the suspension agreement pursuant to the agreement's terms exceeded its authority or was otherwise statutorily improper.

2

CAADES also challenges Commerce's termination of the 2013 agreement on the ground that the government's decision was based on improper political influence. That improper influence, according to CAADES's complaints, stemmed from the FTE's November 2018 letter requesting that Commerce terminate the suspension agreement because it was ineffective, as well as the February 2019 letter from Senator Rubio and forty-seven other members of

---

Koslowe: Yes, there is. And we don't challenge that. The Agreement itself says on 90 days written notice either side can withdraw. Judge: And there doesn't have to be a violation, or—? Mr. Koslowe: Nope. Judge:—a finding that it doesn't meet the requirements of the Act? Mr. Koslowe: No." (citing TRO and PI Hr'g Oral Arg. at 10:05–10:30)).

Congress urging Commerce to terminate the agreement for the same reason.[7]

There is no impropriety in considering an interested party's public request for agency action. *See, e.g.*, *Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 835 F.3d 1377, 1386 (11th Cir. 2016). Nor is there impropriety in legislators urging an agency to take action on the merits based on the ineffectiveness of a prior agency action to remedy a particular problem that affects their constituents. Under these circumstances, the Supreme Court's decision in *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), expressly forecloses a challenge based on alleged political influence. This is particularly so where, as here, the face of the agency decision does not identify that it was motivated by any improper consideration.

*Department of Commerce* concerned the Secretary of Commerce's decision to "reinstate a question about citizenship on the 2020 decennial census questionnaire." *Id.* at 2562. The Secretary attributed the agency's decision to reinstate the question to a December 2017 "request of the Department of Justice" to Commerce that "sought improved data about citizen voting-age population for purposes of enforcing the Voting Rights Act." *Id.* But the "administrative record show[ed] that DOJ's request to add a citizenship question originated not with the DOJ, but with the Secretary himself." *Id.* at 2594 (Breyer, J., concurring in part). It revealed "that the Secretary was determined to reinstate a citizenship question from the time he entered office;

---

[7]    CAADES's complaints pled that the "pressure placed on [Commerce] by Senator Rubio's letter and the fact that FTE (representatives of the domestic industry) wanted to pressure the Mexican Growers to agree to a suspension agreement more favorable to FTE's interests," J.A. 71, were impermissible.

instructed his staff to make it happen"; and "subsequently contacted the Attorney General himself to ask if DOJ would make the [voting-age data] request." *Id.* at 2574 (majority opinion). The challengers' complaint also alleged that, although not the disclosed basis for its decision, the agency's action was in part motivated by the partisan political benefits that the question would have on 2020 redistricting.

The Supreme Court held that Commerce's decision was invalid because it relied on a DOJ request when in fact that request was solicited by Commerce itself. *Id.* at 2575–76. The Court's decision thus rested on its determination that the agency's reasoning was pretextual. *Id.* at 2575 ("[W]e cannot ignore the disconnect between the decision made and the explanation given.").

With regard to the allegation that Commerce's decision was based on political motivation, the Court first explained its reluctance to look behind the face of an agency's decision, recognizing that "judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Id.* at 2573 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)). That an agency's decision might have been based on "other unstated reasons" is not a reason to invalidate it. *Id.*

Second, the Court explained that speculation about alleged improper political influence is not a ground for invalidating agency action:

> [A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities. Agency policymaking is not a "rarified technocratic process, unaffected by political considerations or the presence of Presidential power." Such decisions are routinely

informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others).

*Id.* (internal quotations and citations omitted).

In the present case, the complaints supply no basis for a determination of pretext like the one in *Department of Commerce*. Nor was Senator Rubio's letter an improper communication. The congressional letter, which apparently expressed the same concerns as the FTE letter, is a familiar form of officeholder communication to an agency based on the merits of a proposed agency action. It does not constitute an attempt to influence agency action by considerations other than the merit or lack of merit of the proposed action and the effects on interested parties.[8] So too, there is also nothing on the face of the agency decision to suggest that it was based on any impropriety. Speculation as to improper motive provides no basis to look behind Commerce's stated reason for withdrawal. We conclude that there is no plausible claim upon which the Trade Court could have granted CAADES's requested relief, and we affirm the dismissal of counts 1 and 2.

## II.  2019 Agreement Claims

We turn to the claims concerning the 2019 agreement, which CAADES argues is voidable on grounds of duress.

### A.  Jurisdiction

The government and the FTE argue that, while § 1516a(a)(2)(B)(iv) ("subsection (B)(iv)") grants jurisdiction over challenges to Commerce's "determination . . . to

---

[8]   Even assuming that, under statute, Commerce was obligated to place this letter in the record, CAADES has not shown that this error was harmful.

suspend an antidumping duty . . . investigation," the challenges were not timely because § 1516a(a)(2)(A) requires parties seeking to challenge a suspension agreement under subsection (B)(iv) to file a summons "[w]ithin thirty days after the date of publication in the Federal Register of" notice of the suspension agreement, "and within thirty days thereafter a complaint." Oral Arg. 24:33–24:45; FTE Br. 13–14. Commerce published notice of the 2019 agreement on September 24, 2019, and CAADES filed its earliest summons on November 22, 2019, outside of the thirty-day limit.

But this is not a subsection (B)(iv) challenge to Commerce's "determination . . . to suspend an antidumping duty . . . investigation." The "true nature" of CAADES's challenges is not to Commerce's "determination . . . to suspend," but rather to the actions allegedly undertaken by Commerce to coerce CAADES to execute the agreement. *Hartford Fire Ins. Co. v. United States*, 544 F.3d 1289, 1293 (Fed. Cir. 2008) ("[W]e must look to the true nature of the action in a district court in determining jurisdiction."). Because these challenges are not properly characterized as subsection (B)(iv) challenges, we conclude that CAADES's duress claims are properly within the residual jurisdiction provision and are not time-barred.

## A. Mootness

To the extent that the Trade Court held that CAADES's duress claims were somehow moot, we conclude that they were not. Here, as with the 2013 agreement termination challenge, success on the merits would lead to meaningful relief.

## A. The Merits

The Trade Court appears to have held that CAADES could not challenge the suspension agreement while continuing to accept its benefits. We need not address the

Trade Court's theory because we conclude that CAADES has failed to allege a cognizable claim for duress.

The Trade Court's obligation to accept the complaints' allegations of duress as true does not excuse the requirement that those allegations comprise "a plausible legal theory." *Hutchinson Quality Furniture, Inc. v. United States*, 827 F.3d 1355, 1361 n.4 (Fed. Cir. 2016) (citing *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425–26 (2014)). To render the agreement invalid for duress, CAADES was required to show that "(1) it involuntarily accepted [the government's] terms, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of [the government's] coercive acts." *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1329 (Fed. Cir. 2003) (internal quotation marks omitted) (quoting *Dureiko v. United States*, 209 F.3d 1345, 1358 (Fed. Cir. 2000)).

That CAADES felt "forced" to sign the 2019 agreement, J.A. 60, and that several Mexican growers went out of business while the cash deposit requirement was imposed may satisfy the "involuntary" and "no other alternative" requirements. But CAADES also had an obligation to plead facts showing that its entry into the 2019 agreement was coerced.

When a party claims that the government has committed the allegedly coercive act, proof of coercion requires "[s]ome wrongful conduct" on the part of the government beyond "[e]conomic pressure" or "the threat of considerable financial loss." *Freedom NY*, 329 F.3d at 1330 (quoting *Johnson, Drake & Piper, Inc. v. United States*, 531 F.2d 1037, 1042–43 (Ct. Cl. 1976)); *see also Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1158–59 (Fed. Cir. 1987) (holding that illegal action by the government in violation of a statute or regulation may support allegations of duress); *Sys. Tech. Assocs., Inc. v. United States*, 699 F.2d 1383, 1387–88 (Fed. Cir. 1983) (same); *David Nassif*

*Assocs. v. United States*, 644 F.2d 4, 12 (Ct. Cl. 1981) (same). Specifically, the party must show either government "action in violation of a statute or regulation," "breach of an express provision of [a] contract without a good-faith belief that the action was permissible," or a violation of the "covenant of good faith and fair dealing implicit in every contract." *Freedom NY*, 329 F.3d at 1330.

The alleged coercion here was the resumption of the investigation, which according to CAADES was unlawful because the termination of the 2013 agreement was not in accordance with the statute or was a breach of contract.[9] As we have discussed, the government's termination of the 2013 agreement did not violate a statute or regulation. Nor was it invalid on grounds of improper political influence. So too, the government's termination of the 2013 agreement did not breach any of the 2013 agreement's express contractual provisions because the at-will termination clause permitted "[t]he signatories *or the Department* [to] withdraw . . . upon ninety days written notice to the other party." J.A. 353 (emphasis added).

There is therefore no plausible claim upon which the Trade Court could have found coercion or granted CAADES's requested relief, and we affirm the dismissal of count 4.

II. Claims as to the Final Dumping Determination

In counts 5–7 of the complaints, CAADES also challenges the final determination resulting from Commerce's continued investigation. The Trade Court held that these claims were not ripe for review until a final antidumping order had issued. In *Bioparques de Occidente v. United*

---

[9] CAADES did not plead that the government breached the duty of good faith and fair dealing in terminating the contract.

*States*, No. 2020-2265, we today conclude that materially identical challenges are justiciable "under Supreme Court authority—in particular, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)," and in *Red Sun Farms v. United States*, No. 2020-2230, we conclude that the Trade Court has statutory jurisdiction over such challenges.

In count 3, CAADES also challenges Commerce's resumption of the antidumping investigation following the 2013 agreement's termination. There is no independent jurisdiction over challenges to that interim decision.[10]  *See* § 1516a(a)(1), (2)(a), (b); 33 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 8361 (2d ed.) ("[J]udicial review is available only for 'final' agency actions."); *see also Automated Merch. Sys., Inc. v. Lee*, 782 F.3d 1376, 1380–81 (Fed. Cir. 2015) (agency decision to initiate or continue proceedings cannot be reviewed until issuance of final order); *Gov't of People's Republic of China v. United States*, 483 F. Supp. 2d 1274, 1281 (Ct. Int'l Trade 2007) (holding appellants could challenge Commerce's decision to initiate an investigation after publication of the final determination). We accordingly affirm the Trade Court's dismissal of count 3, reverse the dismissal of counts 5–7, and remand for further proceedings.

## CONCLUSION

For the foregoing reasons, we conclude that the Trade Court had jurisdiction over CAADES's challenges to the termination of the 2013 agreement and the 2019 agreement, and that those claims are not moot. On the merits,

---

[10]    Congress contemplated that decisions such as "a preliminary affirmative antidumping . . . determination or a decision to exclude a particular exporter from an antidumping investigation," would be reviewable "only in connection with the review of the final determination." H.R. Rep. No. 96-1235, at 48 (1980).

we hold that CAADES's challenges as to termination of the 2013 agreement were properly dismissed for failure to state a claim. We also hold that CAADES's claims that the 2019 agreement was invalid for duress failed to state a claim upon which relief can be granted. We affirm the dismissal of counts 1–4. We reverse the Trade Court's holding that CAADES's challenges to the final determination were not yet ripe for review and find that the Trade Court has jurisdiction to hear these claims. We remand for proceedings consistent with this opinion and our opinions in *Bioparques de Occidente v. United States*, No. 2020-2265, and *Red Sun Farms v. United States*, No. 2020-2230.

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

### COSTS

No costs.